### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**Civil Action No.** _____

OLGA SALAZAR, Personal Representative of the Estate of JESUS MARQUEZ,

     Plaintiff,

v.

SAN JUAN COUNTY DETENTION CENTER ("SJCDC"),
SAN JUAN COUNTY,
SAN JUAN REGIONAL MEDICAL CENTER ("SJRMC"),
THOMAS C. HAVEL, INDIVIDUALLY AND AS
ADMINISTRATOR OF SJCDC,
DR. ERIC KETCHAM, INDIVIDUALLY,
CINDY KETCHAM, INDIVIDUALLY,
KATIE (Unknown Surname), RN,

     Defendants.

---

### COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### AND WRONGFUL DEATH

---

COME NOW the plaintiffs, by and through their attorney Mitchel S. Burns, Gregory M. Tucker, Tucker, Burns, Yoder & Hatfield and for their complaint state as follows

### PARTIES AND JURISDICTION

1.    Plaintiff was a resident of San Juan County in the state of New Mexico at the time of his death on March 3, 2015.

2.    Plaintiff suffered injuries and death as a result of insufficient medical care

1

by the Defendants while incarcerated at the San Juan County Detention Center.

3.      Plaintiff claims that Defendants acts were severe and deliberate indifference to his health needs and violations of his civil rights under the United States and New Mexico Constitution.

4.      All of the events described herein occurred in San Juan County, New Mexico, between the dates of July 16, 2014 and March 3, 2015.

5.      Defendant SJRMC is a New Mexico corporation doing business in New Mexico pursuant to a contract with San Juan County to provide medical care to inmates at the San Juan County Detention Center from February 17, 2014 to present.

6.      Defendant Havel is the Administrator of SJCDC and a proper individual to be sued under 14 U.S.C. § 1983 for deliberate indifference and reckless disregard for inmates' care.

7.      Defendant SJRMC is a proper defendant under 42 U.S.C. § 1983 for deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

8.      Defendant SJRMC is a properly named defendant for a negligence claim, as it is a private corporation, not entitled to any immunity under either the Federal Tort Claims Act or New Mexico Tort Claims Act.

9.      Defendants Dr. Eric Ketcham, Cindy Ketcham and Katie Moore are properly named defendants for negligence claims, as they are employees of a SJRMC and not entitled to immunity under either the Federal Tort Claims Act or New Mexico Tort Claims Act.

10.     Defendant San Juan County is the public entity responsible for the San

2

Juan County Detention facility.

11.     Tort claim notice was sent in a proper and timely manner pursuant to the New Mexico Tort Claims Act §41-4-16.

12.     San Juan County is the proper party to be sued for negligent delegation of decision-making authority to SJRMC acting as contractual final delegated decision-makers with respect to the deliberately indifferent policies and practices for the care and treatment of persons incarcerated in the San Juan County Detention Center.

13.     San Juan County is the proper party responsible for the deliberately indifferent and negligent actions of its SJCDC employees.

## STATEMENT OF FACTS

14.     Upon information and belief, the contract between San Juan County and the individual defendants required payment on a per-transport basis for prisoners transported from SJCDC for medical care; SJCDC intentionally established policies, procedures and/or practices to save money by not transporting inmates in need of serious medical care except in the most extreme circumstances.

15.     The individual defendants deprived plaintiff of reasonable medical care by, *inter alia*, refusing to allow them to be treated by physicians except in cases of extreme urgency and delegated their care to non-medical professionals.

16.     As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff suffered a long painful death that should have been prevented.

17.     For several months, the mother of Jesus Marquez, Olga Salazar, contacted the jail complaining that the medical staff had refused to properly treat Jesus

Marquez's diabetes.

18.　　　Due to Jesus' medical condition worsening significantly while being held at San Juan County Detention Center, he was transferred from general population to the medical unit.

19.　　　On March 2, 2015, a detention officer was working in the medical unit when Jesus informed her that he was suffering from severe chest pains.

20.　　　The medical staff treated Jesus' chest pains by taking his vitals and providing him ibuprofen.

21.　　　The medical staff was called to treat Jesus that night and the morning of March 3, 2015.

22.　　　On the morning of March 3, 2015, a detention officer walked by Jesus' cell and noticed he was laying in a very awkward, lethargic position, and was an ash color.

23.　　　The officer banged on his cell and asked, "Jesus, what's wrong?"

24.　　　The officer asked her fellow officers if medical staff had checked on him, and they informed her that they had made the request many times and were repeatedly told medical staff would arrive in thirty minutes.

25.　　　Despite thirty minutes having come and gone multiple times, and medical staff failing to check on Jesus, he was placed in a wheelchair so that he could be transported to court.

26.　　　Jesus was in such dire health that he was unable to get into the transport van.  He fell between the seats and was so weak that officers had to take off his restraints and drag him out of the van.

27.　　　Jesus was brought back to his cell in the medical unit and again

4

informed officers that he could not breathe and renewed his request for a doctor or ambulance.

28.    The detention officers recognized that Jesus' condition was getting very severe.

29.    Jesus' skin was grey, around his eyes it was black like a bruise, and his lips and tongue were a greyish/white color.

30.    One detention officer was also a trained firefighter and performed a capillary refill test on Jesus and determined that he was not receiving oxygen.

31.    The detention officers once again demanded that medical staff examine Jesus, and yet again were informed by medical staff that they will examine him in thirty minutes.

32.    A detention officer then demanded to fellow officers, "you need to get medical staff here now!"

33.    After more time has passed, an officer then made the decision to call medical response as the policy and procedures makes it mandatory for the medical staff to examine Jesus.

34.    According to a detention officer on scene Jesus was out of it, and he kept repeating that he could not breathe.

35.    Medical staff member Katie Moore finally showed up due to a medical response call, and was angry to have been called to examine Jesus.

36.    Nurse Katie used a finger pulse to determine Jesus' heart-rate, but this was not the correct procedure since Jesus was not getting oxygen to his extremities.

37.    Another medical staff took Jesus' blood pressure, and after she got the

reading, showed it to Nurse Katie. Nurse Katie informed her, "that can't be, take it again."

38.     The medical staff took Jesus' blood pressure a second time. After reviewing the results, Katie informed the other staff member to go get her stethoscope.

39.     Jesus again informed them that he could not breathe, and Katie dismissed this by saying, "you can breathe because you are talking to me."

40.     At this time, a detention officer stated, "are you kidding me? You can tell he is in distress, but they aren't acting concerned about it."

41.     All the officers knew something was very wrong with Jesus. One officer stated, "you can't fake your blood pressure. You can't fake your skin color."

42.     At this time, Katie stated, "you can go ahead and clear my first response."

43.     It was grossly negligent to clear the first response when Jesus was showing signs of pulmonary heart failure, and none of the appropriate exams had been performed on him.

44.     With several officers holding Jesus in a sitting position because he was far too weak to do it on his own, Katie took Jesus' blood pressure again, covered the results so no one else could read them and said, "he's fine."

45.     Jesus continued to claim he could not breathe, his sentences fragmented and his speech slurred.

46.     Katie informed the guards, "he just needs some water."

47.     Jesus tried to drink the water he was given, but he could not find his mouth. He managed a few little sips.

48.     Jesus kept going in and out of consciousness, so the medical staff

6

continued to use ammonia sticks on him to keep him awake.

49.      The officers told the medical staff several times that Jesus was dying and they needed to transport him to the hospital. These suggestions were ignored.

50.      It was the position of the medical staff that Jesus could be faking it.

51.      Again, the officer commented about not being able to fake blood pressure and the color of his skin.

52.      Jesus continued to claim he could not breathe and that he needed to go to the hospital. He kept repeating, "tell them to hurry, hurry, hurry."

53.      The officer noticed that Jesus was now bleeding from his mouth.

54.      Despite showing signs of dying from heart failure, Katie and the other medical staff left Jesus and returned to their offices.

55.      The blood coming from his mouth got so bad that it was literally dripping to the floor.

56.      The detention officers were left to treat the medical needs of Jesus, and making decisions during this critical state.

57.      An officer finally stated that they should break protocol and call for an ambulance or Jesus is going to die.

58.      At this point, a sergeant over the detention officers called for an ambulance but informed them not to "run code" which slowed the response time down significantly.

59.      Awaiting for an ambulance, and absent of any medical staff because they had returned to their offices, an officer said, "they are ignoring their Hippocratic oath. Everyone can see he is dying right now."

60.     When medical staff failed to return and the detention officers doing everything they could to keep him alive, an officer stated, "I can't believe they (medical staff) are doing this."

61.     At the very minimum, medical staff should have given Jesus O2, called for an ambulance, and, stayed with Jesus until an ambulance arrived and informed EMS what was going on.

62.     Medical staff didn't show up until a detention officer yelled, "get medical here now! They need to at least be here when EMS shows up."

63.     Some time later, Katie returns and tells the officer, "Oh, I'm sorry. I didn't know I needed to be present during a non-emergency transport."

64.     An argument then occurs when officers are asking medical staff to explain how this situation is not an emergency.

65.     Jesus was moved to the toilet when the officer told Katie about blood coming from Jesus' mouth. Katie dismissed this telling the officer that he probably bit his tongue or something.

66.     Upon examination of Jesus' mouth, it was determined that he had not bitten his tongue, and his tongue, lips, gums were a whitish/grey.

67.     When EMS arrived, the medical staff failed to inform EMS of the situation. At this time, an officer gave them all the relevant facts.

68.     The officer noticed that Jesus' eyes had already began to glaze over.

69.     Jesus could no longer use his legs, so they had to drag him onto the gurney.

70.     As soon as Jesus was loaded in the ambulance, an officer told medical

staff, "and that's not an emergency?"

71.     The officer was informed that Jesus "coded" (flat-lined) once he was loaded onto the ambulance, and was pronounced dead upon arrival at the hospital.

72.     The policies and procedures implemented by Dr. Eric Ketcham, Cindy Ketcham, and Thomas Havel were inadequate to protect the rights of the inmates and created an apathetic atmosphere causing death and serious injury.

## CLAIMS FOR RELIEF

### COUNT I: Violation
### of 42 U.S.C. § 1983
### Eighth Amendment Prohibition Against Cruel and Unusual
### Punishment

73.     Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

74.     42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

75.     Plaintiff was a citizen of the United States; Defendant Havel is a person for purposes of 42 U.S.C. § 1983.

76.     Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference and reckless disregard for known serious medical needs.

77.     Defendant Havel, at all times relevant hereto, was acting under color
of state law.

78.     Havel acted with deliberate indifference to Plaintiffs' serious
medical needs and constitutional rights by willfully ignoring plaintiffs' repeated requests
for medical attention and intentionally deprived plaintiffs of care.

79.     Upon information and belief, Havel instructed SJCDC and SJRMC
staff to act in a manner that deprived persons in need of medical care, such as plaintiff, of
their constitutional rights and violated  SJCDC's internal policies in order to save money.

80.     As a direct and proximate result of defendant's conduct, plaintiff
suffered damages in an amount to be determined at trial.

81.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42
U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

82.     Plaintiff also seeks appropriate declaratory and injunctive relief
pursuant to 42 U.S.C. § 1983 to redress the ongoing deliberate indifference in policies,
training and supervision with respect to the serious medical needs of patients and
inmates in violation of the Eighth Amendment of the Constitution.

## COUNT II:
## NEGLIGENCE

83.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully
set forth herein.

84.     By their complained of series and pattern of intentional actions and
inactions, *de facto* policies, customs, habits, usages, and delegated final decision makers'

decisions, these Defendants acted or failed to act in bad faith and with deliberate indifference to the obvious serious medical needs of Mr. Marquez.

85.     Upon information and belief, these Defendants knew that potentially serious or fatal consequences could be suffered by such individuals by their challenged policies and practices and by their failures to properly train and supervise medical care and/or develop adequate policies.

86.     Defendants violated their duty of care to provide reasonable medical care to citizens, many of whom have not been convicted of any crime, while incarcerated, by, without limitation, delaying medical care, denying proper medications, providing incorrect medications, delegating medical duties to untrained staff, failure to have medical doctors properly supervise, failure to provide adequate care as set forth herein, including improper medication management, and deliberately ignoring plaintiffs' serious medical needs for profit.

87.     SJRMC Defendants are vicariously liable for the negligent acts and omissions of their agents and/or employees and directly liable for their own negligent failures in training, policies, and practices.

88.     Involved caregivers at the jail grossly deviated from that standard of care and were negligent in failing to properly care for and treat Mr. Marquez' known serious medical needs in the health care services they failed to provide. *Inter alia,* defendants failed to properly assess plaintiff, failed to provide proper medications in the proper doses, or at all, failed to evaluate or treat serious medical issues, failed to transport plaintiff to higher-level medical care when required, failed to provide inmates access to medical doctors and left plaintiffs' serious medical needs untreated.

88.     As a direct result of Defendants' unlawful conduct, Plaintiff suffered

11

injuries, damages and losses as described herein entitling them to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

## COUNT III:
### Violations of 42 U.S.C. §§ 12131-12134 The Americans With Disabilities Act ("ADA").

89.     Defendants herein were required by law to observe and adhere to common law and statutory laws and civil rights laws and guarantees in the performance of their duties to or for those who are disable and are detained at the San Juan County Detention Center.

90.     Defendants violated their duties under the ADA to make accommodations to plaintiff with known, obvious, and disclosed disabilities.

91.     As a result of defendants' actions, plaintiff suffered damages as described herein and in an amount to be proven at trial and are entitled to damages, attorneys' fees and costs.

## COUNT V: WRONGFUL DEATH

92.     Plaintiff hereby incorporates all foregoing allegations as if set forth herein.

93.     Defendants, their agents, agencies, and employees breached their duty of care and were negligent in failing to establish appropriate protocols in the management and assessment of inmates presenting with serious medical conditions.

94.     Defendants, their agents, agencies, and employees breached their duty of care and failed to provide access to a medical doctor.

95.     Defendants, their agents, agencies, and employees breached their duty of care and failed to provide Mr. Marquez a medical transport when requested by Mr. Marquez and his mother, Olga Salazar.

96.     Defendant, Dr. Ketcham failed to meet the proper standard of medical care in the evaluation and treatment of Mr. Marquez.

97.     Defendants' acts or omissions proximately caused Mr. Marquez's loss of chance of life, pain, suffering, and ultimate death and extreme emotional distress and other damage.

## COUNT VI: DECLARATORY RELIEF

98.     Plaintiff repeats and reincorporates the allegations above.

99.     Defendants' actions are ongoing, likely to recur, and cause future damages to other inmates detained at the SJCDC.

100.     Declaratory relief in the form of changes to policies, procedures, supervision, training, and contractual payments for medical services is necessary to prevent immediate and irreparable harm, including constitutional and statutory violations, policy violations, serious injury and death.

101.     Plaintiff requests appointment of a special master or other expert to determine what declaratory relief and pursuant to what time frame, will ameliorate the existing situation.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

102.     Award Plaintiff compensatory, non-economic, consequential and economic

Damages as proven at trial against all of the Defendants;

103.    Award Plaintiff special damages as proven at trial;

104.    Award Plaintiff punitive damages relating to the federal claims brought in this matter;

105.    Award Plaintiff attorneys' fees and costs pursuant to the provisions of 42 U.S.C. and the ADA;

106.    Award Plaintiff interest from the earliest possible date under appropriate federal and state statutes;

107.    Grant Plaintiff declaratory relief compelling implementation of constitutionally and statutorily appropriate policies for evaluation and treatment of inmates in need of immediate medical care;

108.    All other appropriate relief at law and equity.

PLAINTIFF RESPECTFULLY REQUESTS A JURY TRIAL ON ALL TRIABLE ISSUES.

/S/ Gregory M. Tucker_____
Gregory M. Tucker
Mitch Burns
Jennifer Yoder
Christian Hatfield
Tucker, Burns, Yoder & Hatfield
105 North Orchard Ave.
Farmington, New Mexico 87401
(505) 325-7755
Greg@tbylaw.com
Mitch@tbylaw.com

15