# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

OLGA SALAZAR, Personal Representative
of the Estate of JESUS MARQUEZ,

        Plaintiff,

vs.                                                                                     No. CIV 15-0417 JB/LF

SAN JUAN COUNTY DETENTION CENTER ("SJCDC"),
SAN JUAN COUNTY, SAN JUAN REGIONAL MEDICAL
CENTER ("SJRMC"), THOMAS C. HAVEL,
INDIVIDUALLY AND AS ADMINISTRATOR OF SJCDC,
DR. ERIC KETCHAM, INDIVIDUALLY, CINDY KETCHAM,
INDIVIDUALLY, KATIE (Unknown Surname), RN,

        Defendants.

       Consolidated with

JESSE BERKEY, EARL CALLAHAN, LARIET CHARLES,
GORDON DOUGLAS DERRICK, AARON EATON,
CALVIN FINCH, PAUL GOULD, JOSEPH GUTIERREZ,
MARK HINOJOS, THOMAS KNIGHT, AURELIO MARQUEZ,
ANGELO MARTINEZ, MARK MARTINEZ, RUDY MARTINEZ,
VICTORIA MARTINEZ, PAUL MATAMOROS,
RICHARD MCDONALD, DEBBIE NEZ, DAVID PAGE,
STEVE PARRISH, CLIFFORD ROGERS, ADAM SCHUESSLER,
JASON TRUJILLO, FRANKLIN TSO, STEVE VALERIO,
JIMMY WEAHKEE and HARRY WILLIAMS,

        Plaintiffs,

vs.                                                                                     No. CIV 15-0439 JB/LF

SAN JUAN COUNTY DETENTION CENTER ("SJCDC")
SAN JUAN COUNTY, CORRECTIONAL HEALTHCARE
COMPANIES, INC. ("CHC"), SAN JUAN REGIONAL
MEDICAL CENTER ("SJRMC"), PRESBYTERIAN MEDICAL
SERVICES ("PRESBYTERIAN"), THOMAS C. HAVEL,
INDIVIDUALLY AND AS ADMINISTRATOR, SAN JUAN
COUNTY DETENTION CENTER,

        Defendants.

Consolidated with

CHARLES CARTER, Personal Representative
of the Estate of WILLIAM "BILLY" CARTER,

   Plaintiff,

vs.               No. CIV 15-0497 JB/LF

SAN JUAN COUNTY DETENTION CENTER ("SJCDC"),
SAN JUAN COUNTY, SAN JUAN REGIONAL MEDICAL
CENTER ("SJRMC"), THOMAS C. HAVEL, INDIVIDUALLY
AND AS ADMINISTRATOR OF SJCDC, DR. ERIC
KETCHAM, INDIVIDUALLY, CINDY KETCHAM,
INDIVIDUALLY,

   Defendants.

Consolidated with

COREY JONES, Personal Representative
of the Estate of Sharon Jones

   Plaintiff,

vs.               No. CIV 15-0526 JB/LF

SAN JUAN COUNTY DETENTION CENTER ("SJCDC"),
SAN JUAN COUNTY, SAN JUAN REGIONAL MEDICAL
CENTER ("SJRMC"), THOMAS C. HAVEL, INDIVIDUALLY
AND AS ADMINISTRATOR OF SJCDC, DR. ERIC
KETCHAM, INDIVIDUALLY, CINDY KETCHAM,
INDIVIDUALLY,

   Defendants.

## MEMORANDUM OPINION AND ORDER

   **THIS MATTER** comes before the Court on the Plaintiff's Motion for Injunctive Relief

Against Defendant San Juan County Detention Center, filed September 28, 2015 (Doc. 48 in

Olga Salazar v. San Juan Cty. Detention Ctr., No. CIV 15-0417 JB/LF (D.N.M.)("Salazar v. San

Juan"))("Motion").  The Court held a hearing on November 24, 2015.  The primary issues are: (i)

whether the Plaintiffs' requested preliminary injunction[1] -- which asks the Court to order Defendant San Juan County Detention Center to provide immediate emergency care to those Plaintiffs suffering from severe medical conditions or, in the alternative, to appoint a special master to oversee medical treatment at the San Juan County Detention Center -- falls within one of the three disfavored categories of such injunctions; (ii) whether the Plaintiffs have a substantial likelihood of succeeding on the merits of their claim that the Defendants violated the Eighth Amendment to the Constitution of the United States of America; (iii) whether the Plaintiffs will suffer irreparable harm between now and a full trial on the merits if the Court does not issue the requested preliminary injunction; (iv) whether the injury that the Plaintiffs will sustain in the absence of the requested preliminary injunction outweighs the injury that the issuance of the requested preliminary injunction will cause the Defendants; and (v) whether issuing the requested preliminary injunction would be adverse to the public interest.  As to the first issue, the Court concludes that the requested preliminary injunction falls into all three of the disfavored categories: it would arguably be a mandatory injunction, rather than a prohibitory one; it would change, rather than preserve, the status quo; and it would shortcut the trial process by providing the Plaintiffs with all the relief that they could hope to obtain from a full trial on the merits.  As to the second issue, the Court concludes that the Plaintiffs have not put forth evidence

---

[1]It is the Court's understanding that the Plaintiffs have requested only preliminary, and not final injunctive relief.  The Motion discusses preliminary injunctions extensively.  See Motion at 6.  Further, at the November 24, 2015, hearing on the Motion, the Court observed that the relief sought is more in the nature of final injunctive relief, see Tr. at 122:5-13 (Court), and the Plaintiffs responded that the relief would be preliminary in so far as the special master would be appointed only for a short period of time, and that he or she would make recommendations, but that they would carry on into the future without the Court's supervision.  See Tr. at 122:14-22 (Hatfield).  In sum, the Court construes the Plaintiffs' request as one seeking preliminary injunctive relief only.  Even if the Plaintiffs, however, intended for their Motion to be construed as one seeking final relief, the Court would nonetheless deny the Motion.  If the Court is declining to grant a preliminary injunction on the record before it, it would not grant a final injunction.

indicating that they will have a substantial likelihood of success on the merits at trial.  As to the third issue, the Court concludes that the harms that the requested injunction seeks to prevent would be irreparable.  As to the fourth issue, the Court concludes that the balance of harms weighs in the Plaintiffs' favor.  As to the fifth issue, the Court concludes that a preliminary injunction would not be adverse to the public interest.  Because failure on any of the four prongs necessitates denial of a preliminary injunction, the Court will deny the Motion.

## FACTUAL BACKGROUND

Pursuant to rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court makes findings of fact and conclusions of law to support its disposition of the Motion.  See Fed. R. Civ. P. 52(a)(2), 65(d)(1).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  "The Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Unlike in a motion for summary judgment, the Court can consider evidence outside the pleadings, including hearsay, when deciding whether to grant a preliminary injunction.  See Pharmanex, Inc. v. HPF, 221 F.3d 1352, at *3 (10th Cir. 2000)(unpublished)[2](citing J. MOORE, MOORE'S FEDERAL

---

[2]Pharmanex, Inc. v. HPF is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The United States Court of Appeals for the Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

PRACTICE § 65.23 (1999)).  Moreover, at summary judgment, the facts may turn out different and there may be genuine issues of material fact.  The Court divides its findings of fact into four sections: first, the Court will introduce the parties; second, it will describe Plaintiff Paul Matamoros's incarceration at the San Juan County Detention Center; third, it will describe non-party Christopher Yarnell's incarceration at the San Juan County Detention Center; fourth, it will describe non-party James Dominguez' incarceration at the San Juan County Detention Center; and fifth, it will describe non-party Martin Veneno's incarceration at the San Juan County Detention Center.

1.    **The Parties.**

1.    The Plaintiffs[3] are current or former inmates at Defendant San Juan County Detention Center.  See Salazar v. San Juan, No. CIV 15-0417 JB/LF (D.N.M.), Complaint for Violation of Civil Rights and Wrongful Death ¶ 2, at 1-2, filed May 15, 2015 (Doc. 1)("Salazar Complaint"); Charles Carter v. San Juan Cty. Detention Ctr., No. CIV 15-0497 JB/LF (D.N.M.), Complaint ¶¶ 2-3, at 1-2, filed June 12, 2015 ("Carter v. San Juan")(Doc. 1)("Carter

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Pharmanex, Inc. v. HPF, Belcher v. United States, 216 F. App'x 821 (10th Cir. 2007), Gaston v. Ploeger, 229 F. App'x 702 (10th Cir. 2007), and Vega v. Wiley, 259 F. App'x 104 (10th Cir. 2007), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[3]The Plaintiffs' Motion requesting injunctive relief is styled as one on behalf of all Plaintiffs in this lawsuit, but three of the inmates involved -- Jesus Marquez, William "Billy" Carter, and Sharon Jones -- are dead.  Further, a number of the remaining twenty-seven named plaintiffs are no longer incarcerated at the San Juan County Detention Center.  Moreover, the Court cannot meaningfully fashion an injunctive remedy for Plaintiffs that are dead or not currently incarcerated at the San Juan County Detention Center.  To the extent that the Court grants injunctive relief, therefore, it should be for the benefit of inmates currently incarcerated at the San Juan County Detention Center.

Complaint"); <u>Corey Jones v. San Juan Cty. Detention Ctr.</u>, No. 15-0526 JB/LF (D.N.M.), Complaint ¶¶ 2-3, at 1-2, filed June 22, 2015 ("<u>Jones v. San Juan</u>")(Doc. 1)("Jones Complaint"); <u>Burkee, et. al. v. San Juan Cty. Detention Ctr.</u>, No. CIV 15-0439 JB/LF (D.N.M.), Second Amended Complaint ¶ 1, at 2, filed July 8, 2015 (<u>Burkee v. San Juan</u>)(Doc. 27)("Burkee Complaint").

2.      Plaintiff Olga Salazar serves as the personal representative of the Estate of Jesus Marquez, who was incarcerated at the San Juan County Detention Center, and was pronounced dead at the hospital after being transported there from the San Juan County Detention Center on March 3, 2015.  <u>See</u> Salazar Complaint ¶¶ 1, 2, 71, at 1, 9.

3.      Plaintiff Charles Carter serves as the personal representative of William "Billy" Carter, who died while incarcerated at the San Juan County Detention Center.  Carter Complaint ¶¶ 1-3, at 1-2.

4.      Plaintiff Corey Jones serves as the personal representative of the estate of Sharon Jones, who died while incarcerated at the San Juan County Detention Center.  <u>See</u> Jones Complaint ¶¶ 1-3, at 1-2.

5.      The remaining twenty-seven named plaintiffs in this lawsuit are individuals who were or are incarcerated at the San Juan County Detention Center between 2013 and the present. <u>See</u> Burkee Complaint ¶ 1, at 2.

6.      One such plaintiff is Paul Matamoros, who is currently incarcerated at the San Juan County Detention Center.  <u>See</u> Motion at 2-3.

7.     Christopher Yarnell[4] is not a party to this lawsuit, but is currently incarcerated at the San Juan County Detention Center.  See Motion at 3-4.

8.     James Dominguez is not a party to this lawsuit, but was an inmate at the San Juan County Detention Center in 2015.  See Motion at 4.

9.     Martin Veneno is not a party to this lawsuit, but was an inmate at the San Juan County Detention Center in 2015.  See Transcript of Hearing at 12:11-13:5 (Burns, Court, Veneno)(taken November 24, 2015)("Tr.").[5]

10.    The San Juan County Detention Center is a jail in Defendant San Juan County, state of New Mexico.  See Carter Complaint ¶¶ 3,12, at 2-3.

---

[4]The Motion is styled as one on behalf of all Plaintiffs, but the Plaintiffs have highlighted the factual circumstances of only one party to this lawsuit -- Matamoros -- and three other current or former inmates of the San Juan County Detention Center that are not parties -- Yarnell, James Dominguez, and Martin Veneno.  In their Motion, the Plaintiffs state:

    21. The above inmates are but a representative sampling of individuals whose medical needs have not been adequately addressed; because of the pressing need for immediate relief; affidavits have not yet been obtained from others with similar unaddressed medical issues.

    22. If emergency injunctive relief is not granted, plaintiffs and other inmates will suffer irreparable harm, including extreme pain, exacerbation of existing medical conditions and possible death.

Motion ¶¶ 21-22, at 5.  The Motion refers to Yarnell, Dominguez, and Veneno as representational parties, but the Plaintiffs have not moved for class certification.  The Court will therefore not treat the Motion as being filed other than on the "Plaintiffs" behalf.  The Court will consider Yarnell's, Dominguez', and Veneno's stories as evidence regarding whether the Plaintiffs will be able to prove that they are likely to succeed on the merits.  These non-parties, however, lack standing to ask the Court to fashion an injunctive remedy, because they are not before the Court and the Plaintiffs have not moved for class certification.  If the Court grants any injunctive relief, it will be designed for the benefit of parties in this case and not for others, although any injunctive relief may incidentally help others.  In sum, the Court is treating the evidence regarding Yarnell, Dominguez, and Veneno as evidence that might lend credibility to the Matamoros' and the Plaintiffs' assertion that they are likely to succeed on the merits.

[5]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

11.     Defendant San Juan Regional Medical Center is a New Mexico corporation doing business in New Mexico pursuant to a contract with San Juan County to provide medical care to inmates at the San Juan County Detention Center from February 17, 2014 to present.  See Salazar Complaint ¶ 5, at 2.

12.     Defendant Correctional Healthcare Companies, Inc. is a Delaware corporation doing business in New Mexico pursuant to a contract with San Juan County to provide medical care to inmates at the San Juan County Detention Center from February 17, 2014 to present.  See Burkee Complaint ¶ 5, at 2.

13.     Defendant Thomas C. Havel is the Administrator of the San Juan County Detention Center.  See Salazar Complaint ¶ 6, at 2.

14.     Defendants Dr. Eric Ketcham, Cindy Ketcham, and Katie Moore are employees of the San Juan Regional Medical Center.  See Salazar Complaint ¶ 9, at 2.

15.     Defendant Presbyterian Medical Services is a New Mexico nonprofit organization doing business in San Juan County pursuant to a contract with San Juan County to provide mental health services to inmates at the San Juan County Detention Center.  See Burkee Complaint ¶ 7, at 2-3.

16.     San Juan County is the public entity responsible for the San Juan County Detention Center.  See Salazar Complaint ¶ 10, at 2-3.

**2.     Matamoros' Incarceration at the San Juan County Detention Center.**

17.     Matamoros is currently in the San Juan County Detention Center, where he has been incarcerated for approximately seventeen months, since July 27, 2014.  See Tr. at 41:15-18 (Hatfield, Matamoros); id. at 59:3-6 (Childress, Matamoros); Affidavit of Paul Matamoros ¶ 2, at 1 (executed September 10, 2015), filed September 28, 2015 (Doc. 48)(the "Matamoros Aff.");

Defendants' Memorandum in Support of Motion for Summary Judgment as to Paul Matamoros' Section 1983 Claim at 1, filed November 11, 2015 (Doc. 102 in <u>Salazar v. San Juan</u>).

18.     Within Matamoros' first month of incarceration he was seen by nurses or physicians at the San Juan County Detention Center and was given medication for back pain and related complaints.  <u>See</u> Progress Notes, Inmate Health Service Request Forms, and Prescription Orders 7/30/14-8/31/14, filed November 18, 2015 (Doc. 102-2 in <u>Salazar v. San Juan</u>)("Exhibit 2").

19.     On September 11, 2014, Matamoros was transported to the San Juan Regional Medical Center for a Lumbar spine MRI, <u>see</u> MRI Report, filed November 18, 2015 (Doc. 102-3 in <u>Salazar v. San Juan</u>)("Exhibit 3"), and on September 30, 2014, he was taken to the San Juan Regional Medical Center for additional diagnostic testing that Dr. Ketcham ordered.  <u>See</u> Consultation & Referral Record, filed November 18, 2014 (Doc. 102-4 in <u>Salazar v. San Juan</u>)("Exhibit 4").

20.     During September and October of 2014, Matamoros continued to be treated at the San Juan County Detention Center for back pain and other medical issues.  <u>See</u> Progress Notes, Inmate Health Service Requests, and Prescriptions Orders 9/1/14-10/31/14, filed November 18, 2014 (Doc. 102-6 in <u>Salazar v. San Juan</u>)("Exhibit 6").

21.     On November 4, 2014, Matamoros was transported to the San Juan Regional Medical Center for evaluation by a physical therapist.  <u>See</u> Consultation and Referral Record, filed November 18, 2014 (Doc. 102-7 in <u>Salazar v. San Juan</u>)("Exhibit 7").

22.     Matamoros had physical therapy sessions at the San Juan Regional Medical Center on eight occasions beginning on November 10, 2014, and ending on December 4, 2014.

See Consultation and Referral Record, filed November 18, 2014 (Doc. 102-7 in <u>Salazar v. San Juan</u>)("Exhibit 7").

23.     During November 2014, Matamoros continued to be treated at the San Juan County Detention Center for his back pain and other medical problems.  <u>See</u> Progress Notes, Inmate Health Service Requests, and Prescription Orders 11/1/14-11/30/14, filed November 18, 2014 (Doc. 102-8 in <u>Salazar v. San Juan</u>)("Exhibit 8").

24.     On December 17, 2014, the diagnostic testing performed on September 30, 2014 was repeated.  <u>See</u> Report of 12/17/14, filed November 18, 2014 (Doc. 102-9 in <u>Salazar v. San Juan</u>)("Exhibit 9").

25.     On September 30, 2014, Matamoros saw Dr. Jonathan Jones MD, a neurosurgeon, who compared the December 17, 2014, test with the September 30, 2014, test, and observed no significant changes.  <u>See</u> Report from San Juan Health Partners Neurosciences, filed November 18, 2014 (Doc. 102-10 in <u>Salazar v. San Juan</u>)("Exhibit 10").

26.     During December 2014, Matamoros continued to receive treatment for his back pain and related ailments.  <u>See</u> Progress Notes, Inmate Health Service Requests, and Prescription Orders 12/1/15-12/31/15, filed November 18, 2014 (Doc. 102-11 in <u>Salazar v. San Juan</u>)("Exhibit 11").

27.     On January 8, 2015, Matamoros was transported to the San Juan Regional Medical Center Neuroscience Department for a follow-up with Dr. Jones, who scheduled an injection for Matamoros.  <u>See</u> Consultation & Referral Record of 1/8/15, filed November 18, 2014 (Doc. 102-12 in <u>Salazar v. San Juan</u>)("Exhibit 12").

28.     On February 13, 2015, Matamoros was transported to the San Juan Regional Medical Center where Dr. Jones gave him an injection.  <u>See</u> Consultation & Referral Record

dated 2/13/15 and Inmate Health Service Request dated 2/15/15, filed November 18, 2015 (Doc. 102-14 in <u>Salazar v. San Juan</u>)("Exhibit 14").

29.     On March 27, 2015, neurosurgeon Dr. Koijan Kainth evaluated Matamoros.  <u>See</u> Report from San Juan Health Partners Neurosciences, filed November 18, 2015 (Doc. 102-17 in <u>Salazar v. San Juan</u>)("Exhibit 17").

30.     Dr. Kainth reported that Matamoros did not have a "life threatening problem" and was "currently neurologically intact."  <u>See</u> Report from San Juan Health Partners Neurosciences, filed November 18, 2015 (Doc. 102-17 in <u>Salazar v. San Juan</u>)("Exhibit 17").

31.     On June 16, 2015, Matamoros had a CT Scan of the Lumbar Spine.  <u>See</u> Consultation & Referral Record, 6/12/15, filed November 18, 2015 (Doc. 102-19 in <u>Salazar v. San Juan</u>)("Exhibit 8").

32.     In addition, Matamoros was transported and treated at the San Juan Regional Medical Center Emergency Room on five other occasions.  <u>See</u> ER Consultation & Referral Record for 4/10/15, 4/15/15, and 5/16/15, filed November 18, 2015 (Doc. 102-20 in <u>Salazar v. San Juan</u>)("Exhibit 20"); Records of ER Treatment for 8/28/15 (dated August 28, 2015)(entered into evidence as Exhibit B at the November 24, 2015 hearing)("Exhibit B"); Records of ER Treatment for 9/24/15, filed October 26, 2015 (Doc. 73-2 in <u>Salazar v. San Juan</u>)(" Records of ER Treatment for 9/24/15").

33.     In addition to these other medical issues, Matamoros has developed a severe rash on his groin and penis.  <u>See</u> Tr. at 41:19-42:16 (Hatfield, Matamoros); <u>id.</u> at 61:17-62:6 (Childress, Matamoros); Motion ¶ 3, at 3; Matamoros Aff. ¶ 2, at 1.

34.     Matamoros began experiencing problems with his penis approximately seven days before August 26, 2015.  See Tr. at 42:4-16 (Hatfield, Matamoros); id. at 63:1-64:8 (Childress, Matamoros).

35.     During those seven days, Matamoros would go to the medical unit at the San Juan County Detention Center "for med pass[6] at 11:00" a.m. and repeatedly tell the nurses that "[he] was having an issue down there."  Tr. at 42:4-43:4 (Hatfield, Matamoros).  See Motion ¶ 4, at 3; Matamoros Aff. ¶ 3, at 1.

36.     During this time, his penis got worse, but the nurses told him that they could not look at it, because Matamoros was male, while they were female, or because there was not a male medical staff member on hand.  See Tr. at 42:4-44:3 (Hatfield, Matamoros).

37.     A female nurse refusing to look at a patient's penis who needs medical attention, because he is male, is generally not a medically sound reason to delay medical care.  See Tr. at 101:2-11 (Rudolf, Tucker); id. at 113:15-21 (Rudolf, Tucker).

38.     If a facility has a policy requiring that a male be present when a male is examined, a facility should make arrangements to get the patient to a place where there is a male person. See Tr. at 101:2-11 (Rudolf, Tucker).

39.     Three days before August 28, 2015, Matamoros began feeling pain in his penis.[7] See Tr. at 112:11-23 (Tucker, Rudolf).

---

[6]The Court does not know the precise meaning of "med pass," but will interpret it as being a pass which authorizes an inmate to visit the medical unit of the San Juan County Detention Center.

[7]There is some dispute whether, when Matamoros arrived at the hospital on August 28, 2015, he reported that he had been experiencing the problem with his penis for three days or whether it was that he had been feeling pain for three days.  The Court concludes that the evidence is consistent with Matamoros having experienced pain beginning three days before his hospital visit on August 28, 2015.  The hospital records from his August 28, 2015, visit to the

40.     Matamoros told them "it was getting serious" and that, if someone did not see it, "[he] was going to call [his] attorney."  Tr. at 44:4-10 (Hatfield, Matamoros).  See Motion ¶ 4, at 3.

41.     Dr. Dwinel[8] then looked at Matamoros' penis and informed him that he needed to "[f]ill out a kite[9]. . . . I need to send you to the emergency room."  Tr. at 44:11-18 (Hatfield, Matamoros).  See Motion ¶ 4, at 3.

42.     Matamoros then filled out a kite, dated August 26, 2015 and a second one on August 27, 2015.  See Tr. at 44:24-45:4 (Hatfield, Matamoros); Motion ¶ 4, at 3; Inmate Health Service Requests 7/1/15-8/27/15 at 16-17, filed October 26, 2015 (Doc. 73-4 in Salazar v. San Juan)("Inmate Health Service Requests 7/1/15-8/27/15").

---

San Juan Regional Medical Center indicate that Matamoros stated: "The pain has been occurring for 3 day(s)."  Records of ER Treatment for 8/28/15 at 2 (dated August 28, 2015)(entered into evidence as Exhibit B at the November 24, 2015 hearing)("Exhibit B").  The records also state: ". . . also has sore on his penis which is painful and been there for the past 3 days."  Exhibit B at 2.  These statements, however, are consistent with Matamoros' assertion that his problem with his penis began earlier -- seven days before August 26, 2015.

[8]The Court has been unable to find Dr. Dwinel's first name in any of the briefing or in the transcript from the November 24, 2015 hearing on the Motion.  The record does indicate, however, that Dr. Dwinel is a male.  See Tr. at 44:11-15 (Matamoros, Hatfield)("And the minute he sees me, he goes, 'Fill out a kite.'  And 'I need to send you to the emergency room.'").

[9]A "kite" or Inmate Health Service Request is a form that an inmate fills out to make a complaint or request for services.  See Tr. at 126:6-24 (Court, Hatfield).  It appears that the word kite has two possible origins.  See Tr. at 149:3-22 (Park).  The first explanation for the term is that inmates would typically fill out a health request form or other communication, but that because correctional facility staff members do not care, they may as well just throw it away.  See Tr. at 149:3-22 (Park).  The second explanation for the origin of the term is that originally when inmates used to communicate with one another, they would throw handwritten notes from one cell to another.  See Tr. at 149:3-22 (Park).  Inmates would attach the note to a piece of string so that in the event that the note did not quite reach the next cell, they could pull it back and try again.  See Tr. at 149:3-22 (Park).  Based on this practice, eventually any type of correctional communication came to be known as a "kite."  See Tr. at 149:3-22 (Park).

43.     On August 28, 2015, Matamoros was transported to the San Juan County Medical Center Emergency Room.   See Tr. at 45:5-25 (Hatfield, Matamoros); Motion ¶ 4, at 3; Matamoros Aff. ¶ 4, at 1; Exhibit B at 1-2.

44.     Between the time when Matamoros first noticed the problem with his penis and when he was transported to the San Juan Regional Medical Center on August 28, 2015, his penis went "from it looking like a blister to starting to eat [his] flesh, to where you could pretty much see [his] urethra[10]. . . . And it got bad.  It was bad."  Tr. at 72:7-14 (Hatfield, Matamoros).

45.     Failing to treat a penis for eight days, if there is an infection causing the symptoms, "could cause ongoing and worsening damage to the penis," and permanent damage. Tr. at 112:24-113:14 (Rudolf, Tucker).

46.     At the San Juan Regional Medical Center Emergency Room, Matamoros tested negative for sexually transmitted diseases, they administered an IV, a doctor looked at his penis, and the doctor diagnosed him with a yeast infection.   See Motion ¶ 5, at 3; Tr. at 46:17-21 (Matamoros); Matamoros Aff. ¶ 4, at 1; Exhibit B at 1-5.

47.     Matamoros' blood was also drawn, and staff at the San Juan Regional Medical Center Emergency Room performed a CT scan of his abdomen and his pelvis.   See Tr. at 66:5-11 (Childress, Matamoros); Exhibit B at 1-5.

48.     "Matamoros was not swabbed or tested for serious, life-threatening illnesses such as MRSA, which are prevalent in jail and take many forms."  Motion ¶ 6, at 3.   See Matamoros Aff. ¶ 3, at 1.

---

[10]The urethra is "the duct by which urine is conveyed out of the body from the bladder and which in male vertebrates also conveys semen."   Urethra, New Oxford American Dictionary (3d ed. 2010).

49.     Matamoros was prescribed fifteen grams of Nystatin cream and 500 milligram tabs of Cephalexin antibiotics.   See Tr. at 44:4-11 (Hatfield, Matamoros); id. at 47:4-11 (Hatfield, Matamoros); id. at 66:12-17 (Childress, Matamoros); Matamoros Aff. ¶ 4, at 1; Exhibit B at 5; Matamoros Prescriptions at 5, filed October 26, 2015 (Doc. 73-5 in Salazar v. San Juan)("Matamoros Prescriptions").

50.     After Matamoros was returned to the San Juan County Detention Center, his penis got worse.   See Tr. at 47:14-18 (Hatfield, Matamoros).

51.     After he returned from the hospital, Matamoros was informed that he had experienced an allergic reaction to the medications he was taking.   See Tr. at 47:16-25 (Matamoros).

52.     Matamoros was eventually switched from Cephalexin to Prednisone antibiotics on approximately September 1, 2015.   See Tr. at 47:20-24 (Matamoros); Matamoros Prescriptions at 5.

53.     His penis started to improve approximately ten days after he began taking the Prednisone.   See Tr. at 48:3-5 (Matamoros); id. at 66:18-68:5 (Childress, Matamoros).

54.     At some point, Matamoros again raised the issue of his penis not healing with the medical staff at the San Juan County Detention Center.   See Tr. at 48:6-18 (Hatfield, Matamoros).

55.     A nurse practitioner and a male guard looked at Matamoros' penis, and the nurse told Matamoros that he would have to see a urologist because his penis was healing incorrectly. See Tr. at 48:8-18 (Matamoros).

56.     Matamoros told them that he had lost all feeling, and she said that he probably would not have feeling there for approximately two years or longer.  See Tr. at 48:6-18 (Matamoros).

57.     Matamoros filed additional kites on September 6, 2015, September 11, 2015,  and September 20, 2015.  See Tr. at 49:7-25 (Hatfield, Matamoros).

58.     The September 6, 2015, kite states: "The skin under my penis is not healing correctly.  It's healing wrong.  I need to be seen ASAP."  Tr. at 49:7-15 (Hatfield, Matamoros).

59.     The September 11, 2015, kite states: "I lost all feeling on the bottom of my penis. It's not healing right.  Please help me."  Tr. at 49:16-19 (Hatfield, Matamoros).

60.     The September 20, 2015, kite states: "I'd like to speak with you about a certain issue that has arose concerning my medical treatment that I would like to clarify with you ASAP."  Tr. at 49:20-25 (Hatfield, Matamoros).

61.     During this time period, Matamoros also made oral complaints to jail personnel, including C. Ketcham.  See Tr. at 50:1-3 (Hatfield, Matamoros).

62.     At some point before September 24, 2015, Matamoros also had blood in his stool and inner hemorrhoids, about which he went to the medical unit.   See Tr. at 55:9-19 (Matamoros).

63.     The medical unit took a stool sample and stated that, if Matamoros had any more issues related to his stool, it would send him to the San Juan Regional Medical Center Emergency Room.  See Tr. at 55:9-19 (Matamoros).

64.     Matamoros and the other Plaintiffs in Burkee v. San Juan filed their amended complaint in this case on July 8, 2015.  See Burkee Complaint at 1.

65.     Also before September 24, 2015, Matamoros completed an affidavit for this preliminary injunction.[11]  See Tr. at 50:18-21 (Hatfield, Matamoros).

66.     On September 24, 2015, Matamoros was again taken to the San Juan Regional Medical Center Emergency Room.  See Tr. at 50:21-51:16 (Hatfield, Matamoros); id. at 68:6-8 (Childress, Matamoros); San Juan Regional Medical Center Medical Records as to Paul Matamoros at 1 (dated September 24, 2015)(entered into evidence as Exhibit C at the November 24, 2015 hearing)("Exhibit C").

67.     At that point, Matamoros' penis was about three quarters of the way through the healing process.  Tr. at 67:24-68:8 (Childress, Matamoros).

68.     Matamoros did not know why he had been taken to the San Juan Regional Medical Center Emergency Room.  See Tr. at 50:21-51:13 (Hatfield, Matamoros); Exhibit C at 1.

69.     At the hospital, doctors told Matamoros to "drop [his] pants because they needed to check [his] penis."  Tr. at 50:25-51:2 (Hatfield, Matamoros).

70.     Matamoros informed the doctors at the San Juan Regional Medical Center that he thought he was there about the blood in his stool.  See Tr. at 51:2-4 (Hatfield, Matamoros).

71.     He further stated that he did not want anything to happen unless he spoke with his attorneys, as he remembered that the injunction had been filed.  See Tr. at 51:4-7 (Hatfield, Matamoros).

72.     The doctors said that he was there about his penis, about which he was complaining, see Tr. at 56:3-4 (Hatfield, Matamoros),  and stated: "Well, we need to do this.  It's per the jail," see Tr. at 51:7-8 (Hatfield, Matamoros).

---

[11]Several days later, on September 28, 2015, Matamoros and the other Plaintiffs filed the Motion for injunctive relief.  See Motion at 1.

73.     Matamoros responded: "Well, this is a great time for you guys to do it.  You guys are far too into it. . . .  It's been too long. . . . .  [W]hy are you guys going to bring me now for this issue, when it's been far too late."  Tr. at 56:5-9 (Hatfield, Matamoros).

74.     Matamoros further stated that he did not have any problems with his penis at that time, that his penis was fine, and that his lawyer was dealing with it.[12]  See Tr. at 56:10-22 (Hatfield, Matamoros); Exhibit C at 1.

_____

[12]There is some dispute what Matamoros told his doctors about his penis problem during his September 24, 2015, visit to the San Juan Regional Medical Center Emergency Room.  At the hearing, Matamoros was asked about "a statement in the medical record where they said that you said, "[i]t's fine."  Matamoros responded that, when he stated it was fine, he was using the word sarcastically.  See Tr. at 56:10-22 (Hatfield, Matamoros).

> Q:     So there is a statement in the medical record where they said that you said, "It's fine."  Did you say, "It's fine"?
>
> A:     When I stated it was fine, I was using it sarcastically.
>
> Q:     What exactly did you tell them?
>
> A:     I said -- I told them, "Yeah, I'm fine," under the impression, besides me not being able to feel my urine, it being numb, and my penis being deformed now, I told them, "Yeah, if you consider that fine, yeah, I'm fine."  But it was sarcastically.  Just by the looks, I believe that the doctors knew that it wasn't fine, though.

Tr. at 56:10-22 (Hatfield, Matamoros).  The Defendants assert that Matamoros was not using the phrase "[i]t's fine" sarcastically.  The Court has examined the original medical records, which do not appear to use the phrase "[i]t's fine."  Exhibit C at 1-12.  Rather, regarding Matamoros' penis problem, the medical records state: "Pt also present with affidavit stating ongoing problems with penile lesions.  Pt presently states that he does not have 'any problems with that' at this time.  And his lawyer is 'dealing with it.'"  Exhibit C at 1.  The Court concludes that, even if Matamoros intended for his comment to be interpreted as sarcastic, the doctors did not take the statement as a sarcastic statement and did not have a sound basis to consider it a sarcastic statement.  The Court does not have a recording of the encounter between Matamoros and the doctors on November 24, 2015, which might shed more light on whether the doctors did or should have interpreted Matamoros' statement as being sarcastic.  The Court therefore concludes, based on the evidence before it, that, during his November 24, 2015, visit to the San Juan Regional Medical Center Emergency Room, Matamoros informed doctors that he did not

75.     Matamoros also presented the doctors with an affidavit concerning his penis problem in relation to the Motion.  See Exhibit C at 1; Tr. at 51:17-52:7 (Hatfield, Matamoros).

76.     Matamoros went ahead and complied with their request, and told them what he had told the jail -- that he does not have any feeling down there, it's deformed, numb, and that he urinates on himself.  See Tr. at 51:9-13 (Hatfield, Matamoros).

77.     While at the San Juan Regional Medical Center Emergency Room on September 24, 2015, doctors also recommended a colonoscopy for Matamoros' stool problem, which took place at a later date.  See Tr. at 69:20-70:16 (Childress, Matamoros).

78.     The skin on Matamoros' "penis is now black, necrotic-appearing, and has open, festering wounds,"[13]  Motion ¶ 7, at 3, and the condition "is so severe it causes [Matamoros] pain and suffering every minute of every day," Matamoros Aff. ¶ 3, at 1.

---

have any problems with his penis at that time, that his penis was fine, and that his lawyer was dealing with it.

[13]In their Motion, the Plaintiffs contend that the danger of losing a penis "poses a high suicide risk for young males if the loss of the organ itself does not lead to death."  Motion ¶ 3, at 3.  The Plaintiffs do not support this assertion with any evidence, such as an academic article or study.  The Court therefore declines to make a finding of fact regarding whether the danger of losing a penis poses a high suicide risk for young men, if the loss of the organ does not itself lead to death.

The plaintiffs also state that Matamoros is "suffering from a severe medical condition, which, if left untreated, will result in immediate and irreparable harm to plaintiff, including severe injury and possible death."  Motion ¶ 2, at 2-3.  Other than citing to an affidavit that Matamoros signed and attached to the Motion, the Plaintiffs do not offer any support for the proposition that the current condition of Matamoros' penis could result in severe injury and possible death.  See Motion ¶ 2, at 2-3 (citing Matamoros Aff.).  The Court finds that the skin on Matamoros' "penis is now black, necrotic-appearing, and has open festering wounds,"  Motion ¶ 2, at 2-3, that his penis is still numb and deformed, and that he is still leaking urine out of his urethra, see Tr. at 48:19-49:6 (Hatfield, Matamoros); id. at 56:23-57:2 (Hatfield, Matamoros).  Looking at the available evidence, however, the Court can go so far only as to say that Matamoros' condition could cause permanent damage.  See Tr. at 113:10-14 (Rudolf, Tucker).

79.     Matamoros' penis is "still numb underneath there," Tr. at 56:23-57:2 (Hatfield, Matamoros), and sometime after the September 24, 2015, emergency room visit, Dr. Dwinell and Dr. Havel stated that "they were going to take [him] to a urologist for the deformation and the numbness, and to see why [he] was still leaking urine out of [his] urethra," id. at 48:19-49:6 (Hatfield, Matamoros).

80.     "Matamoros is currently in fear not only of losing his penis, but of spreading infection that threatens his life."  Motion ¶ 8, at 3.  See Matamoros Aff. ¶ 7, at 1.

81.     "[Matamoros is] in fear of [his] health, losing [his] life, and seriously injuring others through the spreading of whatever disease [he] is carrying."  Matamoros Aff. ¶ 9, at 2.

82.     On another occasion, on July 3, 2015, the medical staff gave him the wrong medication.  See Tr. at 57:3-58:18 (Hatfield, Matamoros).

## 4.     Yarnell's Incarceration at the San Juan County Detention Center.

83.     Yarnell is also currently incarcerated in the San Juan County Detention Center, where he has been incarcerated for approximately five months.  See Tr. at 74:12-14 (Hatfield, Yarnell); Motion ¶ 9, at 3; Affidavit of Christopher Yarnell ¶ 1, at 1 (dated September 18, 2015), filed September 28, 2015 (Doc. 48)(the "Yarnell Aff.").

84.     Nurses from the medical unit come twice per day to give Yarnell his medication. See Tr. at 76:10-14 (Childress, Yarnell).

85.     On approximately August or September 26, 2015, a nurse in the medical unit was giving Yarnell his morning medication  See Tr. at 74:19-22 (Yarnell); id. at 76:10-25 (Childress, Yarnell).

86.     Yarnell informed the nurse giving him his medication that the medication being given to him was not his.  See Tr. at 74:21-24 (Yarnell); Motion ¶ 9, at 3; Yarnell Aff. ¶ 2, at 1.

87.     The pill that the nurse gave him was a different color than what he usually takes, and Yarnell told the nurse: "I've never seen it like that before."  Tr. at 74:24-75:4 (Yarnell); Yarnell Aff. ¶ 2, at 1.

88.     Yarnell "looked at the officer and asked him what [he] should do, and he said that the nurse said it's yours and [he] should take it.  [Yarnell] then took it."  Tr. at 74:24-75:4 (Yarnell).  See Motion ¶ 9, at 3; Yarnell Aff. ¶ 2, at 1.

89.     Several minutes later, Yarnell started to feel "weird, light-headed, really groggy. And [he] knew right away something was wrong."  Tr. at 75:5-7 (Yarnell).

90.     Yarnell then went to the restroom, where he fell down, hit and cut his head on the sink, lost consciousness, and stopped breathing.  See Tr. at 75:7-8 (Yarnell); Motion ¶ 10, at 3-4; Yarnell Aff. ¶ 2, at 1.

91.     He "got up and tried to go to push the button for medical.  But some of the other inmates had already done so."  Tr. at 75:9-10 (Yarnell).

92.     The medical staff eventually came, and "they could not get a pulse because the medication had slowed [Yarnell's] heart down to the point where there was no pulse."  Tr. at 75:10-15 (Yarnell).

93.     The medical staff rushed Yarnell to the San Juan Regional Medical Center Emergency Room.  See Tr. at 75:14-15 (Yarnell); Motion ¶ 10, at 3-4; Yarnell Aff. ¶ 3, at 1.

94.     Once at the emergency room, they did "tests, blood tests, and ran saline through [his] system to dilute the medication that [he] was given."  Tr. at 75:16-18 (Yarnell).  See Motion ¶ 11, at 3-4; Yarnell Aff. ¶ 2, at 1.

95.     Afterwards, Yarnell was released from the San Juan Regional Medical Center Emergency Room and was returned to the San Juan County Detention Center.  See Tr. at 75:18-20 (Yarnell).

96.     He later learned that he had incorrectly been given Seroquel.  See Tr. at 75:21-23 (Hatfield, Yarnell).

97.     Seroquel is a major tranquilizer that relaxes the nervous system, is used for people with insomnia, and calms some psychiatric illnesses.  See Tr. at 99:6-12 (Rudolf, Tucker).

98.     Yarnell did not receive any treatment for taking the wrong medication nor was he treated for hitting his head on the sink.  See Tr. at 77:1-23 (Childress, Yarnell).

99.     Months after this incident, Yarnell was taken to the San Juan Regional Medical Center Emergency Room again for more tests.  See Tr. at 77:1-23 (Childress, Yarnell).

100.    Yarnell had been having severe headaches on the left side of his head, which medical providers have told him resulted from when he fell and hit his head on the sink.  See Tr. at 77:14-23 (Childress, Yarnell).

101.    There is no medical institution where a medical administration error cannot happen, and a medical administration error is not, in and of itself, a serious problem.  See Tr. at 98:11-14 (Rudolf, Tucker).

102.    Where someone questions whether the medication being given to them is the proper medication and states that it does not look like their medication, however, providing appropriate medical care would, at a minimum, require the person administering the medication to double-check that the medication is correct before administering it.  See Tr. at 98:11-100:1 (Rudolf, Tucker).

**5.**     **Dominguez' Incarceration at the San Juan County Detention Center.**

103.   Dominguez was an inmate at the San Juan County Detention Center beginning on August 21, 2015,[14] for a period of nine days.  See Tr. at 79:12-20 (Burns, Dominguez); Motion ¶ 12, at 4; Affidavit of James Dominguez ¶ 1, at 1 (executed September 21, 2015), filed September 28, 2015 (Doc. 48)(the "Dominguez Aff."); Supplemental Response to Motion for Injunctive Relief at 2-3, filed January 7, 2016 (Doc. 158 in Salazar v. San Juan)("First Supplemental Response"); James Dominguez Records from the San Juan Regional Medical Center and the San Juan County Detention Center at 1 (dated August 21, 2015), filed January 7, 2016 (Doc. 158-1 in Salazar v. San Juan)("Dominguez Records").

104.   Dominguez suffers from severe diabetes.   See Tr. at 89:18-90:1 (Childress, Dominguez); Motion ¶ 13, at 4; Dominguez Aff. ¶ 2, at 1.

105.   On approximately March 12, 2012, before Dominguez' incarceration at the San Juan County Detention Center, all five of his toes and part of his right foot were amputated as a result of his diabetes.[15]   See Tr. at 79:21-80:11 (Burns, Dominguez); Tr. at 84:3-10 (Childress, Dominguez); Motion ¶ 13, at 4; Dominguez Aff. ¶ 2, at 1.

---

[14]There is some dispute when Dominguez was incarcerated at the San Juan County Detention Center.  In the Motion and in Dominguez' affidavit and testimony at the hearing, Dominguez referred to a ten-day incarceration beginning on July 21, 2015.  See Tr. at 79:12-20 (Burns, Dominguez); Motion ¶ 12, at 4; Dominguez Aff. ¶ 1, at 1.  Records provided by the Defendants, however, indicate that Dominguez was incarcerated at the San Juan County Detention Center for nine days beginning on August 21, 2015.  See Dominguez Records at 1-14. The Court finds by a preponderance of the evidence that Dominguez was incarcerated at the San Juan County Detention Center for a period of nine days beginning on August 21, 2015, and not on July 21, 2015.

[15]At the hearing on the Motion, Dominguez was cross-examined about his use of methamphetamines before and after his foot surgery.  See Tr. at 84:19-85:17 (Childress, Dominguez).  The Court does not find this information to be relevant to this Motion and will therefore not make findings of fact regarding Dominguez' use of methamphetamines.

106.    At that time, he developed an infection while in the hospital.  See Tr. at 79:25-80:1 (Dominguez).

107.    The infection left a large hole in the right side of his foot, and a doctor that Dominguez saw in April 2015 ordered him to change wound bandages three times per day and to apply antibiotic ointment.  See Tr. at 80:5-20 (Dominguez).

108.    Between April, 2015, and August 21, 2015, Dominguez' wound was healing well and the hole in his right foot had gone from about two inches to approximately the size of a thumbnail.  See Tr. at 83:13-17 (Burns, Dominguez).

109.    When Dominguez was taken into custody and sent to the San Juan County Detention Center on August 21, 2015, his foot had not completely healed, but he could walk without a cane or assistance, and with no pain.  See Tr. at 80:1-11 (Burns, Dominguez).

110.    Also at that time, before his August 21, 2015, incarceration, Dominguez was continuing to change his bandages three times per day and to apply antibiotic ointment pursuant to the doctor's orders.  See Tr. at 80:12-20 (Burns, Dominguez).

111.    Before his incarceration on August 21, 2015, Dominguez had also been taking medications for his diabetes.  See Tr. at 89:18-90:1 (Childress, Dominguez).

112.    Upon being booked into the San Juan County Detention Center on August 21, 2015, Dominguez was immediately taken to the medical unit where he met with a nurse.  See Tr. at 90:23-91:2 (Childress, Dominguez).

113.    Dominguez signed a medical screening form -- dated August 21, 2015 -- which states that Dominguez was not on any medication, that he did not bring any medication with him into the San Juan County Detention Center, and that he had not taken any medications for one

year.   See Tr. at 89:3-90:16 (Childress, Dominguez); First Supplemental Response at 3; Dominguez Records at 1-3.

114.   In response to the question "[d]o you have any medical problems?" the medical screening form indicates that on March 12, 2015, Dominguez' toes and foot were amputated, Dominguez Records at 1-3, and Dominguez orally told the nurse that he needed daily bandage changing and antibiotic ointment for his foot and toes,[16]  see Tr. at 80:14-82:18 (Burns, Dominguez).

115.   The medical screening form further states that he has a medical condition -- "diabetic" -- that requires a special diet, and Dominguez informed the nurse that he needed diabetic trays for meals as well as diabetic medications.[17]  Dominguez Records at 2; Tr. at 89:24-90:1 (Childress, Dominguez).

---

[16]The medical screening form thoroughly documents that Dominguez informed the nurse of his amputated foot and toes, which is consistent with the San Juan County Detention Center's decision to place him in the Medical Unit.   See First Supplemental Response at 3; Dominguez Records at 1-4.   The Court concludes that this documentary evidence is consistent with Dominguez' assertion that he told the nurse that he needed daily bandage changing, and antibiotic ointment, for his foot and toes.   See Tr. at 80:14-82:18 (Burns, Dominguez).   The Defendants appear to dispute, however, that Dominguez informed them about his need for antibiotic ointment, pointing to the signed medical screening form which states that Dominguez had not taken any medications for one year.   The Court does not conclude, however, that medications are the same thing as antibiotic ointment and can understand why Dominguez might not have mentioned the ointment in response to a question about medications.   The word medication typically evokes images of an oral pill, and the medical screening form itself under "ROUTE" lists "oral, injection, etc . . . ." in parentheses.   Dominguez Records at 1.   The Court therefore concludes that Dominguez's assertion that he told the nurse that he needed antibiotic ointment is not inconsistent with the medical screening form's statement that Dominguez stated that he had not taken any medications for one year.

[17]The Defendants appear to dispute that Dominguez informed the nurse that he needed diabetic medications by pointing to the medical screening form's statement that Dominguez said that he had not taken any medications for one year.   The medical screening form, however, notes that Dominguez informed the nurse of his special diet because he is diabetic, see Dominguez Records at 2, and the Court finds that documentary evidence consistent with Dominguez' assertion that he also informed the nurse of his need for diabetic medications.   Particularly if

116.     Dominguez was placed in the Medical Unit because of his need for wound care. See First Supplemental Response at 3; Dominguez Records at 1-4.

117.     Dominguez did not receive a diabetic tray except for one day in the ten days that he was incarcerated at the San Juan County Detention Center.  See Tr. at 89:3-90:16 (Childress, Dominguez).

118.     Dominguez subsequently asked the guards and the nursing staff if they could change his bandages two or three times per day, but they did not comply with his request.  See Tr. at 81:17-82:23 (Burns, Dominguez); Dominguez Aff. ¶ 3, at 1.

119.     After five days of incarceration, the medical staff began bandaging Dominguez' foot and applying bacitracin, an antibiotic ointment.  See Tr. at 82:24-83:6 (Burns, Dominguez); Motion ¶ 17, at 4; Dominguez Aff. ¶ 3, at 1; First Supplemental Response at 3; Dominguez Records at 10-14.

120.     "Once [he] was finally being provided antibiotics, [he] was not given the correct dosage of antibiotics as prescribed and was given the antibiotics less frequently than prescribed." Dominguez Aff. ¶ 4, at 1.

121.     By that time, Dominguez  "couldn't even walk.  [His] right leg swelled up four times the size of [his] left leg.  And it was so painful, [he] couldn't walk.  They used to have to take [him] to the clinic appointments and whatnot in a wheelchair."  Tr. at 83:7-12 (Burns, Dominguez).  See Dominguez Aff. ¶ 5, at 1.

---

Dominguez mentioned his diabetic medications in response to a question about his special diet, the Court can understand how the nurse might not have properly noted his need for diabetic medications.  The Court thus finds that Dominguez informed the nurse of his need for diabetic meals as well as his need for diabetic medications.

122.    Dominguez' foot became infected and worsened.  See Tr. at 83:3-22 (Burns, Dominguez); Motion ¶ 16, at 4; Dominguez Aff. ¶ 5, at 1.

123.    Because of the five-day delay and foul condition of Dominguez' wound, nursing staff had to disinfect and scrub the wound site five times, which is extremely painful and preventable.[18]  See Motion ¶ 18, at 4; Dominguez Aff. ¶ 7, at 1; First Supplemental Response at 3; Dominguez Records at 10-14

124.    Failing to provide bandages for five days and antibiotics for seven days could lead to a serious bacterial infection that could result in complications such as the loss of the foot in an extreme case, if the infection were to spread.  See Tr. at 96:5-12 (Tucker, Rudolf).

125.    Dominguez' leg starting to smell bad and swelling up to three times larger than his other leg are symptoms consistent with infection, and one of the causes of such an infection could be the failure to provide proper wound care.  See Tr. at 96:13-22 (Tucker, Rudolf).

126.    The care that Dominguez received at the San Juan County Detention Center was medically "inadequate."  Tr. at 97:19-98:2 (Tucker, Rudolf).

---

[18]In their First Supplemental Response, the Defendants state that Dominguez' "wound was cleaned at least five times during Mr. Dominguez' nine day stay," and they attach records for the five cleanings.  First Supplemental Response at 3 (citing Dominguez Records at 10-14).  As the Defendants acknowledge in footnote 1 of their First Supplemental Response, three of the forms documenting Dominguez' wound cleanings are not dated.  See First Supplemental Response at 3.n1.  One of the five forms is dated August 29, 2015, see Dominguez Records at 13, one of the forms is dated August 27, 2015, see Dominguez Records at 14, but the three remaining forms are undated.  Dominguez' testimony persuades the Court that there was a five-day delay in him receiving wound care, and the Court concludes that the documentary evidence is consistent with that conclusion.  Given that the two dated wound cleaning forms are dated August 27, 2015, and August 29, 2015, the Court concludes that it is likely that the three undated wound cleanings took place on August 25, August 26, and August 28, 2015, but it cannot be certain that Dominguez did not receive multiple cleanings on a single day.  In any event, without evidence to the contrary, the Court has no reason to doubt Dominguez' testimony that there was a five-day delay in him receiving wound care.

6.     __Veneno's Incarceration at the San Juan County Detention Center.__

127.     Veneno is a retired police officer who spent fourteen years working for the Jicarilla Apache Nation in Dulce, New Mexico.  See Tr. at 12:4-20 (Burns, Veneno).

128.     Veneno suffered a heart attack and at some point was hospitalized in 2014.  See Tr. at 12:21-13:1 (Burns, Veneno).

129.     In 2015, Veneno learned that his driver's license was not current and he went to municipal court in Farmington to straighten it out on October 5, 2015.  See Tr. at 13:20-25 (Burns, Veneno).

130.     At municipal court, Veneno learned that he had an outstanding warrant for an old traffic ticket.  See Tr. at 13:11-14:5 (Burns, Veneno).

131.     The Farmington Police Department arrested Veneno and booked him into the San Juan County Detention Center on October 5, 2015.  See Tr. at 13:9-14:7 (Burns, Veneno); id. at 30:5-7 (Childress, Veneno); Martin Veneno Records from the San Juan Regional Medical Center and the San Juan County Detention Center at 1 (dated October 5, 2015), filed January 7, 2016 (Doc. 158-2)("Veneno Records").

132.     At that time, Veneno had been prescribed certain medications for his heart condition and was taking twelve to thirteen pills, including Lisinipril, Carvedilol, Lipitor, Brilinta, Sodium Bicarbonate, and Lantus Soln.  See Tr. at 14:15-15:20 (Burns, Veneno).

133.     Veneno is also an insulin dependent diabetic and has been taking insulin daily for the past thirty years.  See Tr. at 15:19-22 (Burns, Veneno).

134.     Veneno did not have any of his medications with him when he was arrested and admitted to the San Juan County Detention Center.  See Tr. at 30:14-21 (Childress, Veneno); First Supplemental Response at 4; Veneno Records at 1.

135.    When Veneno was booked into the San Juan County Detention Center, he told

them that he was insulin diabetic -- Type 2 -- and that he had a heart condition for which he took

heart medication daily.  See Tr. at 16:1-10 (Burns, Veneno).

136.    Veneno's medical screening form reflects that, on October 5, 2015, the date he

was incarcerated, a nurse named "Yvonne" was notified of his medical conditions.  Tr. at 34:1-

11 (Childress, Veneno).

137.    Veneno, however, could not remember his medications, and he refused to sign a

Release of Information that would have allowed medical personnel to obtain records for Veneno.

See First Supplemental Response at 4; Veneno Records at 1-5.

138.    The medical screening form also indicates that Veneno refused a special diet for

being diabetic.[19]  See First Supplemental Response at 4; Veneno Records at 2.

139.    Veneno was jailed at the San Juan County Detention Center for a total of five

days, during which he did not receive his insulin or his heart medication, although he asked or

begged for it on numerous occasions.  See Tr. at 16:11-23 (Burns, Veneno).

140.    Veneno, however, never filled out and submitted a formal, written medical

request form.  See First Supplemental Response at 4; Veneno Records at 1-11.

141.    Veneno's son had Veneno's medications, but Veneno did not have money or a

money card to telephone his son, and the security guard denied his request to use their private

telephone to call him to obtain his medications.  See Tr. at 30:22-31:15 (Childress, Veneno).

---

[19]The Court finds by a preponderance of the evidence that Veneno refused a special diet
for being diabetic when he was booked into the San Juan County Detention Center on October 5,
2015.  As reflected in this Memorandum Opinion and Order's findings of fact 130 through 140,
the Court also finds that Veneno's verbal request for diabetic meals was denied on several
occasions.  While it is a close call, the Court credits Veneno's testimony and finds that although
he refused a special diet when he was booked into the San Juan County Detention Center on
October 5, 2015, he later made verbal requests for a special diet, which were refused.

142.    On Monday evening, the first day of Veneno's incarceration, he was served a meal consisting of meat and/or fried food.  See Tr. at 17:2-16 (Burns, Veneno).

143.    Veneno told them that he could not eat that meal because of his medical condition of being diabetic, and they responded: "Well, that's all we've got.  You have to eat it.  It was served to you, you have to eat that food."  Tr. at 17:2-18:3 (Burns, Veneno).

144.    At some point on Monday, Veneno also requested his insulin shot, because he had not received it that day.  See Tr. at 18:4-14 (Burns, Veneno).

145.    He said to security: "Please, I do need my insulin.  I haven't got my insulin today. I need my insulin shot."  Tr. at 18:6-12 (Veneno).

146.    Security ignored his request.  See Tr. at 18:10-11 (Veneno).

147.    Veneno also told them that he "needed [his] oral pills for [his] heart condition, but [he] was ignored again."  Tr. at 18:11-12 (Veneno).

148.    On Tuesday, October 6, 2015, Veneno again told security that he was supposed to take about seven oral pills in the morning and that he needed them.  See Tr. at 18:15-23 (Burns, Veneno).

149.    Veneno told security: "I do need to see a nurse or some medical staff . . .  I do need to take those pills."  Tr. at 18:15-23 (Veneno).

150.    By Tuesday, October 6, 2015, Veneno had started to feel weak and/or dizzy, and he started to feel pain in his chest.  See Tr. at 18:24-19:4 (Burns, Veneno).

151.    On Tuesday, October 6, 2015, Veneno was again served a meal, but he could not eat it because of his medical condition.  See Tr. at 19:14-20:1 (Burns, Veneno).

152.    He also received Kool-Aid to drink, which he was also not able to drink because of the sugar content.  See Tr. at 19:14-20:1 (Burns, Veneno).

153.    By Wednesday, October 7, 2015, Veneno was experiencing more pain, like "needles . . . going through [his] chest . . . on the left side."  Tr. at 20:2-10 (Burns, Veneno).

154.    He felt numbness in his arms, and he was limited in his ability to use them.  See Tr. at 20:2-10 (Burns, Veneno).

155.    On Thursday, October 8, 2015, Veneno "beg[ged] the security guard" for his insulin and heart medication, telling them that "[he] was really in pain," that "[his] chest [was] really hurting," and that "[his] arms [were] turning black and blue."  Tr. at 20:11-21:4 (Burns, Veneno).

156.    Veneno was then taken to a nurse, where he was given a Tuberculosis ("TB") shot in his arm.  See Tr. at 21:5-14 (Burns, Veneno).

157.    Veneno asked the nurse why she was giving him a TB shot, and she responded that he was "probably going to be in the kitchen to work."  Tr. at 21:16-20 (Burns, Veneno).

158.    Veneno told her to look at his arms, that he had no business being in the kitchen handling food and that he "I need[ed his] insulin shot" right away.  Tr. at 21:15-22:1 (Burns, Veneno).

159.    She said: "Oh, when we get some time, when we get some time, we'll go ahead and tend to you."  Tr. at 22:3-4 (Burns, Veneno).

160.    Veneno responded: "I've been asking this every night every morning. . . .  You people here have not even paid any attention to me, not one time."  Tr. at 22:5-7 (Burns, Veneno).

161.    On Friday morning at 3:00 a.m., Veneno was moved along with some other inmates from a cell called B1 to C1.  See Tr. at 22:8-25:17 (Burns, Veneno).

162.    Veneno had difficulty carrying his belongings and, after a confrontation with the guards, he finally dragged them to his new cell.  See Tr. at 22:8-25:17 (Burns, Veneno).

163.    Once in his new cell, the inmates there ran to him, picked up his belongings, and helped him into his bed, where he went to sleep.  See Tr. at 22:8-25:17 (Burns, Veneno).

164.    On Friday, Veneno was awaken very early and told that he would have kitchen duty.  See Tr. at 25:18-26:12 (Burns, Veneno).

165.    A nurse was standing at the doorway, and she checked that he had a TB shot.  See Tr. at 26:7-12 (Burns, Veneno).

166.    Veneno showed her his arms again, which were completely purple and blue by that point, and she responded, "You go ahead.  The security guard wants you to go to the kitchen."  Tr. at 26:7-20 (Burns, Veneno).

167.    Veneno proceeded to the kitchen along with the other prisoners, where he was given the job of "washing trays and scraping the food off the trays, and lifting like 20 to 25 trays at one time, and putting it in place."  Tr. at 27:1-5 (Burns, Veneno).

168.    Veneno informed the head cook that he was having difficulty doing this job, and he was subsequently assigned the task of mopping the floor.  See Tr. at 27:22-28:2 (Burns, Veneno).

169.    Veneno struggled to mop the floor, because "the mop [was] really heavy" and "[his] arms were so weak, [he] couldn't even mop the floor or nothing."  Tr. at 28:3-5 (Burns, Veneno).

170.    Veneno asked to go to the restroom, because he was "going to throw up" and "[didn't] feel so good."  Tr. at 28:3-7 (Veneno).

171.    The head cook responded: "No, you just keep doing what you have to do there." Tr. at 28:8--9 (Veneno).

172.    Veneno told the security guard standing there: "Sir, you're going to have to do something for me here.  I can't do this."  Tr. at 28:8-12 (Veneno).

173.    Veneno then turned around and was going to walk back over to begin mopping again, but "[w]hen [he] turned around, everything got dizzy.  [He] got dizzy, and everything just started turning, and [he] fell.  [He] fell on [his] back.  [H]e went backwards and [he] fell.  And [he] don't know what happened to [him] there.  [H]e fainted.  [H]e just forgot everything."  Tr. at 28:13-20 (Veneno).

174.    A guard immediately called for medical assistance, and Veneno was immediately transported by an ambulance to the hospital, where he woke up in a pool of blood.  See Tr. at 28:21-29:5 (Burns, Veneno); id. at 36:4-23 (Childress, Veneno); First Supplemental Response at 4.

175.    Veneno was told that he had experienced a severe, massive heart attack, and he received five stints in his right artery.  See Tr. at 29:6-15 (Burns, Veneno).

176.    The San Juan Regional Medical Center Emergency Room contacted Veneno's son.  See Tr. at 37:1-20 (Childress, Veneno).

177.    Veneno's son, at that point, spoke with the judge and various authorities to have Veneno released, and the judge released Veneno, because he should not have been incarcerated. See Tr. at 37:1-38:14 (Childress, Veneno).

178.    Both diabetes and a heart condition require daily ongoing medical care, and the maintenance of proper medications.  See Tr. at 101:19-102:6 (Rudolf, Tucker).

179.    If an individual with diabetes and a heart condition does not take his or her medications, the consequences are serious.  See Tr. at 101:22-102:6 (Rudolf, Tucker).

180.    Failure to continue administering diabetes medications on a regular basis can lead to severe metabolic derangements that can result in extreme situations in a coma or death.  See Tr. at 101:24-102:5 (Rudolf, Tucker).

181.    Failure to continue administering heart medications on a regular basis can lead to "heart attack, potentially leading to death."  Tr. at 101:24-102:5 (Rudolf, Tucker).

182.    An individual's arms turning purple and black are "symptoms that could be consistent with cardiovascular disease" and "in someone with [Veneno's history] would absolutely raise . . . suspicions."  Tr. at 102:7-12 (Rudolf, Tucker).

183.    It would increase the risk of a patient, who suffers from diabetes and a heart conditions, to send him or her to work in the kitchen and do manual labor.  See Tr. at 102:13-19 (Rudolf, Tucker).

184.    It "certainly increase[] the probability that someone with heart disease is going to have an acute cardiac event, if he's not taking medications that are designed to prevent such an event."  Tr. at 102:20-103:3 (Rudolf, Tucker).

## PROCEDURAL BACKGROUND

The Court will briefly outline this case's progress and summarize the parties' arguments for and against the Motion.  The Court will first describe what has happened in the case besides the Motion.  It will then describe, in turn, the Plaintiffs' and the Defendants' arguments vis-à-vis the Motion.

1.      **The Case's Pre-Motion Background**.

1.      On May 15, 2015, Salazar, as the personal representative of the Estate of Marquez, filed a complaint in the United States District Court for the District of New Mexico in <u>Salazar v. San Juan</u>.  <u>See</u> Salazar Complaint at 1.  On June 12, 2015, C. Carter, as the personal representative of the Estate of W. Carter, filed a complaint in the United States District Court for the District of New Mexico in <u>Carter v. San Juan</u>.  <u>See</u> Carter Complaint at 1.  On June 22, 2015, C. Jones, as the personal representative of the Estate of S. Jones, filed a complaint in the United States District Court for the District of New Mexico in <u>Jones v. San Juan</u>.  <u>See</u> Jones Complaint at 1.  Each of the three individual plaintiffs assert causes of action for: (i) violations of the Eighth Amendment's prohibition on cruel and unusual punishment under 42 U.S.C. § 1983; (ii) negligence; (iii) violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134; and (iv) wrongful death.  Salazar Complaint ¶¶ 73-97, at 9-13; Carter Complaint ¶¶ 38-64, at 6-10; Jones Complaint ¶¶ 34-60, at 5-9.  Each of the individual Plaintiffs also requests that the Court provide identical declaratory relief:

> Plaintiff repeats and incorporates the allegations above.
>
> Defendants' actions are ongoing, likely to recur, and cause future damages to other inmates detained at SJCDC.
>
> Declaratory relief in the form of changes to policies, procedures, supervision, training, and contractual payments for medical services is necessary to prevent immediate and irreparable harm, including constitutional and statutory violations, policy violations, serious injury and death.
>
> Plaintiff requests appointment of a special master or other expert to determine what declaratory relief and pursuant to what time frame, will ameliorate the existing situation.

Salazar Complaint ¶¶ 98-101, at 13; Carter Complaint ¶¶ 65-68, at 10-11; Jones Complaint ¶¶ 61-64, at 9.  On July 8, 2015, twenty-seven plaintiffs filed their amended complaint in the United

States District Court for the District of New Mexico in <u>Burkee v. San Juan</u>.   <u>See</u> Burkee

Complaint.   The twenty-seven plaintiffs in <u>Burkee v. San Juan</u> assert causes of action for: (i)

violations of the Eighth Amendment's prohibition on cruel and unusual punishment under 42

U.S.C. § 1983; (ii) negligence; (iii) ADA violations; and (iv) intentional infliction of emotional

distress.   <u>See</u> Burkee Complaint ¶¶ 154-178, at 21-25.   They also request the same declaratory

relief as the individual plaintiffs in <u>Salazar v. San Juan</u>, <u>Carter v. San Juan</u>, <u>Jones v. San Juan</u>.

<u>See</u> Burkee Complaint ¶¶ 179-182, at 25.

> 2.     The four cases -- <u>Salazar v. San Juan</u>, <u>Carter v. San Juan</u>, <u>Jones v. San Juan</u>, and

<u>Burkee v. San Juan</u> were subsequently consolidated before the Court for the purposes of

discovery and motions, but the parties agree that they will be tried separately.   <u>See</u> Transcript of

Hearing at 3:18-9:4 (taken September 24, 2105)(Court)("Sept. 24th Tr.");[20] <u>id.</u> at 13:7-22

(Childress, Court, Hatfield, Kelly, Mowery, Park).

> **2.      The Plaintiff's Motion.**

> 3.     The Plaintiffs request a preliminary injunction:

>> ordering defendant San Juan County Detention Center to provide immediate
>> emergency medical care to inmates whose medical needs are not being met; in the
>> alternative, plaintiffs request appointment of a medical doctor unaffiliated with
>> the defendants in this case to oversee medical conditions and operations at the San
>> Juan County Detention Center until defendants can demonstrate to the Court that
>> inmates' constitutional right to adequate medical care is being met.

Motion at 9.   The Plaintiffs maintain that they and other inmates continue to suffer from

untreated or improperly treated medical issues and conditions that pose an immediate risk of

harm or death.   <u>See</u> Motion at 2.   In seeking an injunction, the Plaintiffs outline the factual

circumstances of one plaintiff -- Matamoros -- and two non-parties -- Yarnell and Dominguez.

---

[20]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

See Motion at 2-4.  The Court has already outlined its factual findings as to these individuals

based upon the motion, affidavits, and testimony at the November 24, 2015 hearing.  In light of

these individuals' experiences at the San Juan County Detention Center, the Plaintiffs assert:

> 19.     There is immediate and imminent threat of death and further violations of plaintiffs' right to be free from cruel and unusual punishment and other Constitutional violations if the San Juan County Detention Center is not compelled to take immediate action to prevent further injuries and deaths; grave and systemic deficiencies in provision of medical care to inmates at the jail is ongoing and rises to the level of deliberate indifference to the inmates medical needs.
>
> 20.     Coupled with the injuries suffered by the names plaintiffs listed in Plaintiffs' Second Amended Complaint, the pattern of deliberate indifference to inmates medical needs has not been remedied since the inception of this litigation. 2d Am. Compl.
>
> 21.     The above inmates are but a representative sampling of individuals whose medical needs have not been adequately addressed; because of the pressing need for immediate relief, affidavits have not yet been obtained from others with similar unaddressed medical issues.
>
> 22.     If emergency injunctive relief is not granted, plaintiffs and other inmates will suffer irreparable harm, including extreme pain, exacerbation of existing medical conditions and possible death.

Motion at 4-5.

4.     The Plaintiffs next provide an overview of preliminary injunctions, the rights that

inmates have to medical care, and the standard for a violation under the Eighth Amendment.  See

Motion at 5-6.  The Plaintiffs contend that "[p]risoners are entitled to basic medical care while

incarcerated," Motion at 5 (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)), and that

"[d]eliberate indifference to inmates' medical needs is shown when officials prevent an inmate

from receiving medical care or denies access to medical personnel capable of evaluating the need

for treatment," Motion at 5 (citing Inmates of Alleghany Jail v. Pierce, 612 F.2d 754, 762 (3d

Cir. 1979)).  The Plaintiffs then quote the Supreme Court of the United States of America:

>We have held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society . . . .
>
>These elementary principles establish the government's obligation to provide medical care for those whom it is punishment by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such failure may actually produce physical torture or lingering death . . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose . . . . The infliction of such suffering is inconsistent with contemporary standards of decency . . . We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . . proscribed by the Eighth Amendment.

Motion at 5-6 (quoting Estelle v. Gamble, 429 U.S. at 102-103).

5.     The Plaintiffs next quote from the United States District Court for the Southern District of Indiana's decision in Young v. Ballis, 762 F. Supp. 823 (S.D. Ind. 1990), where the district court stated that, "[d]efined broadly, a preliminary injunction is an injunction that is issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." Motion at 6 (quoting Young v. Ballis, 762 F. Supp. at 826). Moreover, the Plaintiffs assert that, to obtain a preliminary injunction, they must make four showings: (i) irreparable injury unless the injunction issues; (ii) the threatened injury outweighs any damages the injunction might cause the opposing party; (iii) the injunction would not be adverse to the public interest; and (iv) a substantial likelihood on the merits. See Motion at 6 (citing Navajo Health Foundation v. Burwell, No. CIV 14-0958 JB/GBW). The Plaintiffs recognize that the United States Court of Appeals for the Tenth Circuit has noted that three forms of preliminary injunctions are specially disfavored: (i) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (iii) preliminary injunctions that afford the movant all the relief it could recover after a full trial on the merits. See Motion at 6 (citing

- 38 -

Navajo Health Foundation v. Burwell, No. CIV 14-0958 JB/GBW).  The Plaintiffs contend that, in this case they are requesting a mandatory preliminary injunction.  See Motion at 6.  The Plaintiffs assert that,

> [a]s Young [v. Ballis] noted:
>
> In cases such as this, claims that jail conditions are so poor that they are constitutionally violative, money damages are inadequate.  The plaintiffs are seeking to correct conditions which presently exist; conditions which they contend pose an immediate threat to the health and safety of the inmates of the jail.  These claims have no adequate remedy at law.

Motion at 6-7 (quoting Young v. Ballis, 762 F. Supp. at 827).

6.      On the irreparable-harm prong, the Plaintiffs argue that the danger of irreparable harm is real and present.  See Motion at 7.  They assert that death is irreparable, that deaths have occurred at the San Juan County Detention Center -- three in 2015 alone -- and that there is a likelihood of future deaths.  See Motion at 7.  The Plaintiffs further contend that "the pain and suffering of inmates not being provided adequate medical care, and the fear of illness and death, are also irreparable in terms of mere money damages."  Motion at 7.

7.      As to the substantial-likelihood-of-success prong, the Plaintiffs contend that they have either been injured or died while incarcerated.  See Motion at 7.  According to the Plaintiffs, "[t]he primary fact questions at trial will be: how did these injuries and deaths occur and who could have prevented them?"  Motion at 7.  They assert that the Defendants will likely attempt to establish that "the plaintiffs caused the harm to themselves, were not harmed, or, if they were, that the defendants' conduct was not the proximate cause."  Motion at 7.  The Plaintiffs maintain that the basic fact remains that incarcerated persons lack the ability to provide medical care for themselves and are completely at the mercy of their jailers.  See Motion at 7.

8.      On the balance-of-harms prong, the Plaintiffs assert that the only detriment to the Defendants -- for example, in assigning an independent doctor to review all inmate medical issues on a weekly or bi-weekly basis -- would be monetary.  See Motion at 7.  The Plaintiffs maintain that, if the independent doctor identifies and rectifies serious deficiencies in medical care, the long-term cost savings to the county would offset any additional costs expended.  See Motion at 7.  The Plaintiffs quote the Tenth Circuit for the proposition that, "[w]hile an inmate does not have a federal constitutional right to rehabilitation, he is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well-being."   Motion at 7 (quoting Ramos v. Lamm, 639 F.3d 559, 566 (10th Cir. 1980)).  Further, according to the Plaintiffs, "(i)t is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment."  Motion at 7 (quoting Ramos v. Lamm, 639 F.3d at 568)(parenthesis in original).  The Plaintiffs further analyze the Tenth Circuit's decision in Ramos v. Lamm:

> The court went on to note that the state has a duty to provide medical care for those it incarcerates:
>
> > Although the constitutional requirement for adequate health care has not been fully spelled out, the Supreme Court has held that in the context of a § 1983 action . . . that only deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment proscription against cruel and unusual punishment.
>
> Id. at 574-75 (citing Estelle v. Gamble, 429 U.S. 97 (1976))(internal quotations omitted).
>
> > A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.
>
> Id. at 575 (internal citation omitted).  Examples include, among others, inmates with dental problems being forced to wait an inordinate amount of time before receiving dental care (as has been alleged in this case), with resultant infections,

- 40 -

abscesses, "unnecessary pain and loss of teeth." *Id.* at 576 (internal citation omitted).  Failures to transport, delays in transport, and lack of proper psychiatric care, among others.  *Id.* at 577.

> When the entire system for delivering medical services is challenged, deliberate indifference to inmates' health needs may be shown by proving repeated examples of denials of medical care which disclose a pattern of conduct by the prison medical staff, or by proving there are such systemic and gross deficiencies in staffing, equipment, or procedures that the inmate is effectively denied access to adequate medical care.

*Id.* at 575.

Motion at 7-8.  In sum, according to the Plaintiffs, the Tenth Circuit in Ramos v. Lamm affirmed the district court's order to provide the plaintiffs with basic human needs or close the facility. See Motion at 8-9 (citing Ramos v. Lamm, 639 F.3d at 586).

### 3.    The Response in Opposition to the Motion.

9.    The Defendants filed their Response to the Motion on October 26, 2015.  See Response to Plaintiffs' Motion for Injunctive Relief Against Defendant San Juan County Detention Center, filed October 26, 2015 (Doc. 73 in Salazar v. San Juan)("Response").  The Defendants contend that the Plaintiffs fail to meet the requirements for injunctive relief and, therefore, ask the Court to deny the Motion.  See Response at 2.  Broadly speaking, the Defendants assert principally two arguments: (i) the Plaintiffs lack standing to seek injunctive relief for Yarnell and Dominguez; and (ii) as to Matamoros, the Plaintiffs "cannot meet the heightened burden for disfavored injunctions and for injunctions directed at jails."  Response at 21.

10.    The Defendants first attack the Plaintiffs' suggestion that the inmates referenced in their Motion "are a sufficient 'representative sampling' to establish that irreparable harm will be suffered by all of the Plaintiffs in the Second Amended Complaint if a preliminary injunction

is not issued." Response at 2. The Defendants argue that there are no common issues of fact among the Plaintiffs that would allow for the experience of one or two individuals to be representative of all the Plaintiffs. See Response at 2-3. According to the Defendants, the Plaintiffs' alleged conditions range from high blood pressure to dental problems to a skin condition. See Response at 3. They further assert that the Complaints are equally dissimilar in that they range from an alleged failure to receive certain diagnostic tests to an alleged failure to schedule a thumb surgery. See Response at 3. The Defendants argue that many of the Plaintiffs in the Second Amended Complaint are also no longer inmates at the San Juan County Detention Center and for that, reason, any injunctive relief would be improper, as being moot to inmates no longer incarcerated. See Response at 3. The Defendants maintain that the plaintiffs must satisfy a stringent, heightened burden to prove that a preliminary injunction is warranted, and that the submission of Affidavits relating to a few individuals, with no supporting medical evidence, cannot meet that burden. See Response at 3. Moreover, the Defendants assert that the individual Plaintiffs' claims must be evaluation separately, as to both injunctive relief and damages. See Response at 3.

11. The Defendants next argue that the Plaintiffs lack standing to seek relief for Yarnell and Dominguez. See Response at 4. The Defendants assert that neither Yarnell nor Dominguez are parties to this lawsuit and that any injunction must be applied only to the plaintiffs to the lawsuit, because a federal court may not determine the rights of persons not before it.[21] See Response at 4 (citing Zepeda v. United States Immigration & Naturalization Serv., 753 F.2 719, 727 (9th Cir. 1983)). The Defendants further contend that one of the

---

[21]The Defendants recognize in a footnote that there is an exception to this rule, but "one of the requirements for the exception is a showing that there is some hindrance to the third-party's ability to protect his or her own interests." Response at 4 n.4.

requirements for the issuance of an injunction is a showing that the petitioner will suffer irreparable harm traceable to the conduct of the respondent and that, where the alleged conduct no longer affects a petitioner, any attempt at injunctive relief is inappropriate as moot. According to the Defendants, because Dominguez is no longer incarcerated at the San Juan County Detention Center, injunctive relief is inappropriate.  See Response at 5 (citing Hollon v. Mathis Indep. Sch. Dist., 491 F.2d 92, 93 (5th Cir. 1974)).

12.    The Defendants then move to their assertion that Matamoros is not entitled to injunctive relief, which they spend the remainder of their brief addressing.  See Response at 5. According to the Defendants, only Matamoros' claim is before the Court and any injunctive relief must be narrowly tailored to that claim.  See Response at 5.  The Defendants concede that Matamoros is a plaintiff in this lawsuit and remains incarcerated, but nonetheless contend that he is not entitled to any relief under the four-pronged test for issuance of a preliminary injunction. See Response at 5.  The Defendants first address the irreparable-harm prong, contending that Matamoros offers no medical evidence to support his contention that he is in fear of severe injury or possible death.  See Response at 6.   The Defendants cite to William v. Brar, 2012 U.S. Dist. LEXIS 50315, at *1-3 (E.D. Cal. Apr. 9, 2012), where, in denying injunctive relief to an inmate, the United States District Court for the Eastern District of California stated:

> Plaintiff's motion is not supported by any admissible evidence that he is likely to suffer irreparable harm in the absence of relief. . . . The issue is one of medical care and Plaintiff is not qualified to offer his opinion that he is being subjected to experimental drugs or that he is likely to suffer irreparable harm absent intervention.

Motion at 6.

13.    The Defendants assert that, as the Plaintiffs concede, they are seeking a preliminary injunction that is disfavored.  See Response at 7.  The Defendants contend that such

disfavored injunctions must be more closely scrutinized, see Response at 7 (citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005), and that, where a prison inmate seeks an order enjoining prison officials, courts are required to proceed with the utmost care and must recognize the unique nature of the prison setting, see Response at 7-8 (citing Lowe v. Vadlamudi, 2008 U.S. Dist. LEXIS 108150, at *6-8 (E.D. Mich. June 6, 2008).  The Defendants assert that the Plaintiffs' burden is a heightened and stringent one.  Moreover, the Defendants argue that, although the Plaintiffs appear to seek a mandate merely to provide medical treatment, their "real request appears to be the alternative relief seeking the appointment of an independent medical doctor to oversee medical conditions and operations at the [San Juan County Detention Center]."  Response at 8.  The Defendants assert that, in light of this preference for the alternative requested relief, the Plaintiffs seek to alter the status quo and obtain the kind of affirmative action falling into the category of mandatory injunctive relief.  See Response at 8.  According to the Defendants, a party "seeking such a disfavored injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms,"  Response at 8 (quoting Navajo Health Foundation v. Burwell, 2015 U.S. Dist. LEXIS at *123), and the Plaintiffs cannot make such a showing, see Response at 8.

14.    The Defendants next address the likelihood-of-success-on-the-merits prong, contending that the "Plaintiffs cannot make the required 'strong showing with regard to the likelihood of success on the merits'" on their Eighth Amendment claim.  Response at 9 (quoting Navajo Health Foundation v. Burwell, 2015 U.S. Dist. LEXIS at *123).  The Defendants argue that, for the Plaintiffs to succeed on a claim for inadequate medical attention, they must show "deliberate indifference to serious medical needs."  Response at 9 (quoting Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)).  The Defendants contend that the test for deliberate

indifference is both objective and subjective.  See Response at 9 (citing Martinez v. Beggs, 563 F.3d at 1088).  According to the Defendants, the objective component of the test is met "if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment," Response at 9 (citing Martinez v. Beggs, 563 F.3d at 1088), while the subjective component requires showing "that the defendants knew [they] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it. . . ," Response at 9 (Martinez v. Beggs, 563 F.3d at 1089).  Moreover, the Defendants contend that "evidence of medical treatment belies a claim of deliberate indifference," Response at 9 (citing Randall v. Bd. of Cty. Comm'rs, 184 F. App'x 723, 727 (10th Cir. 2006)(unpublished)), and that a prisoner who merely disagrees with a diagnosis or course of treatment does not state a constitutional violation, see Response at 9 (citing Perkins v. Kan. Dep't of Corrs., 165 F.3d 803, 811 (10th Cir. 1999)).

15.    The Defendants argue that, in this case, Matamoros has received medical treatment -- including for the specific injury set forth in the Motion -- and that he has not offered any medical evidence to support his assertion of inadequate medical care.  See Response at 9-10. They further assert that the available medical records point in the opposite direction.   See Response at 10.  The Defendants first point to attached medical records from Matamoros' visit to the hospital on August 28, 2015, explaining:

> Mr. Matamoros' complaint was of groin/flank pain.  The History of Present Illness notes that he "has sore on his penis which is painful and been there for the last 3 days."  The records indicate that extensive blood work was done, as was a CT Scan of the abdomen and pelvis.  Medications were also administered and prescribed.  Thus, Mr. Matamoros' implication that he had suffered from the condition for an extensive period of time before getting treatment is belied by the medical records.  In addition, in light of the extensive testing which was done, the complaint of not being tested for certain conditions is the kind of disagreement with medical decisions that does not rise to the level of a constitutional deprivation.  Perkins, 165 F.3d at 811.

Response at 10.

16.     The Defendants also point to attached medical records from a hospital visit on September 24, 2015.  See Response at 10.  According to the Defendants, the "History of Present Illness" notes "Rectal Bleeding" and states: "Pt also present with affidavit stating ongoing problems with penile lesions.  Pt presently states that he does not have 'any problems with that' at this time."  Response at 10.  The Defendants argue that, with respect to Matamoros' penis problem that the Motion outlines, it had been resolved by the time doctors saw Matamoros on September 24, 2015, before the Plaintiffs filed the Motion with the Court.  See Motion at 10-11. The Defendants contend that, because the problem was resolved, the Plaintiffs cannot show that Matamoros will suffer irreparable harm if the Court denies the Motion.  See Response at 11. Additionally, the Defendants maintain that the requested injunctive relief is unnecessary to address the alleged harm, because the condition is being or has been treated.  See Response at 11.

17.     The Defendants further argue that the Court must also consider Matamoros' specific claims in the Second Amended Complaint to determine whether he is likely to succeed on the merits.  See Response at 11.  According to the Defendants, in the Second Amended Complaint, Matamoros "complains that he wanted different pain medication than what was being administered for his alleged back problems."  Response at 11.  The Defendants maintain that such alleged harm would "not even meet the objective component of the test for deliberate indifference, as it is not sufficiently serious to be a cognizable claim."  Response at 11 (citing Curran v. Aleshire, 67 F. Supp. 3d 741, 766 (E.D. La. 2014)).  According to the Defendants, Matamoros also complains in the Second Amended Complaint of not being sent to a neurosurgeon.  See Response at 11.  The Defendants assert that the medical records directly undermine this assertion in that they reflect that Matamoros saw Dr. Koijan Kainth on April 3,

2015.  See Response at 11.  According to the Defendants, Dr. Kainth stated that it was not a life-

threatening problem and that Matamoros was currently neurologically intact; she did not

recommend treatment or medications different from those that the San Juan County Detention

Center was administering.  See Response at 11.  The Defendants argue that, even if Matamoros

"was denied treatment by a specialist, such denial does not rise to the level of a constitutional

violation."  Response at 11 (citing Woodson v. Barlow, 2012 U.S. Dist. LEXIS 73952 (W.D.

Okla. 2012)).

      18.    The Defendants conclude their argument why Matamoros is unlikely to succeed

on the merits of his Eighth Amendment claim by explaining:

> Thus, the fact that Mr. Matamoros has seen a specialist and has been treated on
> numerous occasions for complaints of back pain and other complaints shows that
> the SJCDC was anything but indifferent to his needs.  In addition to hospital
> visits, Mr. Matamoros was frequently treated at the SJCDC.  To give the Court an
> idea of how frequently the SJCDC responded to Mr. Matamoros' complaints,
> County Defendants have attached medical records generated from July 1, 2015, to
> August 31, 2015.  Mr. Matamoros filed seventeen Inmate Health Service Request
> Forms, ranging from diet requests (7/1/15) to nail fungus complaints (7/1/15,
> 7/4/15) to headaches (7/6/15, 8/5/15) to back pain (7/10/15) to constipation
> (7/11/15, 8/3/15) to surgery requests (7/18/15) to spider bites (8/17/15).  The
> Responses to the Requests, which appear at the bottom of each Request, show that
> Mr. Matamoros' concerns were consistently addressed.  Progress Notes and
> Physician Order Sheets show that Mr. Matamoros was seen in the SJCDC clinic,
> was treated, and was prescribed medications.  Again, this type of scenario defeats
> any claim of deliberate indifference.  Thus, Mr. Matamoros' Eighth Amendment
> claim asserted in the Second Amended Complaint fails as a matter of law.  As Mr.
> Matamoros cannot show irreparable harm and cannot succeed on the merits of his
> claim, the MotInjunc should be denied.

Response at 11-12.

      19.    The Defendants next argue that Matamoros cannot show a likelihood of success

on the merits of his other claims, including his claims of negligence, violations of the ADA, and

intentional infliction of emotional distress.  See Response at 13.  Regarding the ADA claim, the

Defendants argue that there is no allegation that Matamoros is being discriminated against

because of a qualifying disability under the ADA. <u>See</u> Response at 13-14. Further, the Defendants assert that to the extent that the Court finds that Matamoros received inadequate treatment -- an allegation that the Defendants contest -- the Defendants assert that Matamoros does not state that any alleged inadequacy was a result of a qualifying disability as the ADA defines that term. <u>See</u> Response at 14. The Defendants contend that Matamoros is also unlikely to succeed on the state law claims of negligence and intentional infliction of emotional distress. <u>See</u> Response at 14. The Defendants maintain that the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. § 41-4-2, governs state law tort claims against governmental entities, but according to the Defendants, the Plaintiffs cannot point to any waiver of immunity under the NMTCA for the asserted claims. <u>See</u> Response at 14-15. The Defendants contend that the only potentially applicable waivers are the waiver in § 41-4-9 for operation of certain medial facilities and the waiver in § 41-4-12 for certain law enforcement acts. <u>See</u> Response at 14. The Defendants assert, however, that the legislature did not waive immunity in § Section 41-4-12 for negligence standing alone and § 41-4-12 also does not waive immunity for a claim of intentional infliction of emotional distress. <u>See</u> Response at 14-15. Additionally, the Defendants argue that the Court of Appeals of New Mexico's decision in <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-085, 187 P.3d 179, forecloses reliance on § 41-4-9. <u>See</u> Response at 15.

20.     The Defendants next argue that the other equitable factors weigh against the Court issuing a preliminary injunction, including the balance of harms to the parties and whether the issuance of a preliminary injunction would serve the public interest. <u>See</u> Response at 15. According to the Defendants, these two factors merge when the United States is the opposing party. <u>See</u> Response at 15. The Defendants assert that the Plaintiffs' argument that there is a likelihood of future deaths is unsupported and purely speculative. <u>See</u> Response at 17. Further,

the Defendants contend that Matamoros' medical records show that he is not in danger of immediate death from any of his medical conditions or treatments he has received or will receive.   The Defendants argue that there is no evidence that the three deaths at the San Juan County Detention Center "were the result of any systemic constitutionally inadequate medical treatment."  Response at 17.  The Defendants also point out that the San Juan County spends a substantial amount of money on medical care for inmates at the San Juan County Detention Center, which they contend should be taken into account in balancing of harms.  See Response at 17-18.  The Defendants cite to Citizens for Rational Coastal Development v. United States FHA, 2008 U.S. Dist. LEXIS 43260, at *21-22 (D.N.J. May 29, 2008), for the proposition that "the cost of compliance with a preliminary injunction is a factor to be considered in weighing the balance of harms."  Response at 18.  The Defendants assert that the Plaintiffs have not offered any estimates of the cost of hiring an independent medical doctor and that they believe the costs would be substantial.  See Response at 18.  The Defendants further state that, if the San Juan County Detention Center were to succeed on the merits, it would have no way of recouping the expenditure.  See Response at 18.  Moreover, given these circumstances, the Defendants assert that the balance of harms and public interest favors the San Juan County Detention Center and that a preliminary injunction is improper.  See Response at 18-19.

21.     Last, the Defendants argue that "[t]he broad scope of the requested relief in the MotInjunc is wholly improper."  Response at 19.  According to the Defendants, the requested relief's scope is not "narrowly drawn," extends far beyond what would be "necessary to correct the [alleged] harm" against Matamoros, and is not the "least intrusive means necessary to correct that [alleged] harm."  Response at 19-20 (quoting 18 U.S.C.S. § 3636)(brackets in Response)).  Moreover, the Defendants assert that the relief sought might be appropriate after the Court has

sufficient evidence to make findings of constitutional violations, but the scant evidence offered by the Plaintiffs is insufficient.  See Response at 20.

**4.    The Reply.**

22.    The Plaintiffs did not file a reply to the Defendants' Response.

**5.    The Hearing on the Motion.**

23.    The Court held a hearing on the Motion on November 24, 2015.  The hearing consisted of both oral argument and witness testimony.  See Tr. at 1.

24.    The Plaintiffs first briefly re-asserted their arguments from their briefing and clarified that they are not asking the Court to continually supervise the San Juan County Detention Center.  See Tr. at 5:1-6:2 (Hatfield).  Rather, the Plaintiffs asked that the Court appoint a special master to advise and to inform the Court.  See Tr. at 6:2-7 (Hatfield).  The Defendants made two preliminary observations.  See Tr. at 6:14-9:3 (Childress).  The Defendants explained that the Motion is directed solely at San Juan County, but that San Juan County contracts with the San Juan Regional Medical Center to provide medical care for inmates at the San Juan County Detention Center.  See Tr. at 6:14-24 (Childress).  Moreover, the Defendants asked the Court to keep in mind that the Plaintiffs are asking for relief for problems in which San Juan County is not involved in.  See Tr. at 6:24-7:1 (Childress).  According to the Defendants, the Motion seeks two forms of alternative relief: (i) that the inmates at the San Juan County Detention Center be provided medical care, which they already receive; or in the alternative (ii) that some kind of medical director, which already exists, be appointed to oversee the medical treatment at the San Juan County Detention Center.  See Tr. at 7:2-14 (Childress).  The Defendants then re-asserted some of their arguments from their briefing.  See Tr. at 7:11-9:3 (Childress).

25.     The Plaintiffs called five witnesses who presented testimony -- Veneno, Matamoros, non-party Christopher Yarnell, Dominguez, and Dr. Jonathan Rudolf.   The Defendants cross-examined each witness, and the Plaintiffs redirected.   The Defendants did not present any witnesses, See Tr. at 116:5-13 (Childress, Court), but the Court admitted four of the Defendants' exhibits into evidence, see Exhibit C; Exhibit B; San Juan Regional Medical Center Medical Records As to Marvin Veneno (dated October 5, 2015)(entered into evidence as Exhibit A at the November 24, 2015 hearing)("Exhibit A"); San Juan Regional Medical Center Medical Records As to James Dominguez (dated August 21, 2015)(entered into evidence as Exhibit D at the November 24, 2015 hearing)("Exhibit D").

26.     The parties then presented brief closing arguments.  See Tr. at 116:23-25 (Court). The Plaintiffs asserted that they had provided the Court with a "sampling that gives an idea of the different kinds of inadequacies in medical care that overall lead to in the aggregate a systemic injury . . .  In the aggregate the systemic injury constitutes deliberate indifference."  Tr. at 117:7-15 (Hatfield).   The Plaintiffs maintained that they have met all four prongs of the test for injunctive relief in that: (i) irreparable harm is clear; (ii) there is a likelihood of success on the merits; (iii) there is no public interest problem here; and (iv) the balance of harms favors injunctive relief.  See Tr. at 117:17-119:14 (Hatfield).

27.     The Court pressed the Plaintiffs on what exactly an opinion granting a preliminary injunction would look like.  See Tr. at 119:15-17 (Court).  The Plaintiffs responded that the Court can make it as minimal as possible and that they do not want the Court to be involved in overall supervision for a long period of time.  See Tr. at 119:18-22 (Hatfield).  The Plaintiffs suggested that the Court could appoint a special master -- presumably a doctor -- who could have access to the records, and the policies and procedures, of the San Juan County Detention Center.

<u>See</u> Tr. at 119:22-120:2 (Hatfield).  The special master could make suggestions to the Court on a preliminary basis, and then produce a report and recommendations to the Court that would prevent future systemic injury to incarcerated individuals.  <u>See</u> Tr. at 120:3-7 (Hatfield).  The Plaintiffs stated that they are open to suggestions or modification, but that the special master might, for example, recommend that a doctor should be present at the San Juan County Detention Center on a more regular basis to evaluate complaints from inmates and refer those in need of emergency care to the hospital.  <u>See</u> Tr. at 120:7-121:4 (Hatfield).

28.     The Court observed that this relief is more in the nature of final injunctive relief -- that the proposed injunction is not trying to maintain the status quo until trial, but rather, to change the status quo and protect people, forever.  <u>See</u> Tr. at 122:5-13 (Court).  The Plaintiffs responded that the relief would be preliminary in so far as the special master would be appointed only for a short period of time, and that he or she would make recommendations, but that they would carry on into the future without the Court's supervision.  <u>See</u> Tr. at 122:14-22 (Hatfield). The Court then asked whether Matamoros has been convicted and is serving a sentence.  <u>See</u> Tr. at 123:5-10 (Court, Hatfield).  The Plaintiffs responded: "I don't even know at this stage, Your Honor, I think he's still a pretrial detainee, but he does manage to get out and go back sometimes."  Tr. at 123:11-14 (Hatfield).  The Court then observed that the Eighth Amendment certainly applies to convicted individuals, but it was not sure whether it and the deliberate indifference standard applies to pre-trial detainees.  <u>See</u> Tr. at 123:15-21 (Court).  The Plaintiffs stated: "Yes, your Honor in the case law I've read I believe that the Supreme Court has held that the Eighth Amendment standard of pretrial detainees is the same as for prisoners."  Tr. at 123:22-25 (Hatfield).

29.     The Court then asked whether the complaints regarding medical care might be more in the nature of a malpractice suit against the doctors for not diagnosing properly or for the level of care, rather than a constitutional case involving deliberate indifference.  See Tr. at 124:1-9 (Court).  The Plaintiffs responded that they do not think it is medical malpractice, because when doctors see people, they tend to receive good care.  See Tr. at 124:10-13 (Hatfield).  The Plaintiffs contended that the problem is access to the doctors, follow-up care, and nonmedical professionals making decisions that doctors should make.  See Tr. at 124:13-17 (Hatfield).  The Plaintiffs agreed with the Court that the problem is not the level of care which the contracted health care providers provide, but rather, that the problem is "the interaction of the people who are involved . . . the guards, the nurses, the medical staff at the jail actually getting them out of jail to medical care, getting follow-up afterward."  Tr. at 124:18-125:12 (Court, Hatfield).  The Plaintiffs confirmed that the problem is that the San Juan County Detention Center is not getting inmates over to the medical center promptly or adequately.   See Tr. at 125:13-16 (Court, Hatfield).  The Plaintiffs further agreed that any appointed special master would not be so much reviewing what doctors do, but rather, would have the authority to review everything concerning the inmates' medical care, and would also review "kites" or complaint forms, to determine whether inmates need to be sent to the hospital.  See Tr. at 125:17-13 (Court, Hatfield).

30.     The Court then asked whether the problem is with the nurses, and the Plaintiffs responded that the nurses are a huge problem.  See Tr. at 128:24-25 (Court, Tucker).  The Court observed that it seems that the nurses are or were seeing inmates daily and sometimes twice daily, and asked whether the problem is that they "are gatekeepers and not allowing the inmates to see doctors."  Tr. at 129:1-5 (Court).  The Plaintiffs confirmed that, in the case of Marquez, for example, the inmates were yelling at the nurse telling her that he needed to be treated and

that, without an ambulance, he would die.  See Tr. at 129:6-12 (Tucker).  The Plaintiffs explained that an inmate or jail guard eventually called the ambulance, and that the nurses refused to treat him the entire time.  See Tr. at 129:12-16 (Tucker).  The Plaintiffs confirmed that it does appear that there is a problem with the medical side of inmate care -- given that the problem is associated with the nurses -- but asserted that there are also problems with the guards refusing to transfer people to the medical units or to provide medication to inmates.  See Tr. at 129:17-130:7 (Court, Tucker).

31.     The Court then stated that the Plaintiffs are not bringing a class action and are not representing everybody in the facility; rather, they are representing approximately twenty-seven individuals and estates.  See Tr. at 130:11-16 (Court).  The Court then asked, given that the Plaintiffs only have one person that is still in the facility, why it needs to enter preliminary injunctive relief as to the entire facility.  See Tr. at 130:16-20 (Court).  The Court further inquired whether it should not simply be evaluating the Motion on the basis of Matamoros' circumstances alone, to make sure that he gets good medical care, rather than providing facility wide relief.  See Tr. at 130:20-24 (Court).  The Plaintiffs responded that such limited relief

> would affect the end of justice . . . .  Otherwise we'll be in this position every six months forever. . . .  If we take long enough and don't get injunctive relief some of these people will die some of them will be released and Mr. Childress will have the same argument when we file the next lawsuit each time and just will be denied forever . . . .

See Tr. at 130:25-131:7 (Hatfield).

32.     The Defendants then presented their closing argument.  See Tr. at 131:10-140:10 (Childress, Court).  The Defendants largely stuck to arguments from their briefing, but they emphasized that the medical care at the San Juan County Detention Center is completely contracted out to the San Juan Regional Medical Center and that "they provide all of the medical

treatment at the facility."  Tr. at 131:15-20 (Childress).   According to the Defendants, if the Court were to appoint someone to oversee medical treatment, the San Juan County Medical Center would say "we weren't even involved in this motion" and "did not have a chance to respond to it."  Tr. at 131:20-1132:8 (Childress).  They further emphasized that Matamoros is the only person that has standing to request an injunction and that, on the basis of the evidence regarding his medical treatment, the Court should not issue an injunction.  See Tr. at 133:1-136:16 (Childress, Court).  The Court pushed back and asked whether, if it was concerned about Matamoros and his medical care, what kind of injunction it could issue.  See Tr. at 136:17-137:2 (Childress, Court).  The Defendants responded that Matamoros already sees a nurse every day, and that the only thing they could propose, is to enjoin the San Juan County Detention Center to take Matamoros to the emergency room anytime he wants to go.  See Tr. at 137:3-138:9 (Childress).  The Defendants also maintained that, on the basis of the evidence that the Court has heard as to Matamoros, it is evident that he received a tremendous amount of treatment and the records indicate that his problem is basically resolved.  See Tr. at 139:11-140:9 (Childress).  Finally, the Court asked the Defendants about the size of the San Juan County Detention Center.  See Tr. at 139:7-10 (Court).  The Defendants responded that the facility averages over 600 prisoners on a daily basis and that it is quite large for what one would expect in San Juan County.  See Tr. at 139:11-14 (Childress).  The Defendants further stated that they believe the facility has some holding cells, about six or seven pods, and a medical unit that has about eight or nine places for people to be housed.  See Tr. at 139:16-20 (Childress).

33.     The Court then gave the Plaintiffs the last word on the Motion.  See Tr. at 140:10-12 (Court).  The Plaintiffs asserted that Matamoros' penis problem is not resolved, but that they were supportive of the Court imposing narrowly tailored injunctive relief.  See Tr. at 140:13-20

(Hatfield).  The emphasized, however, that it would be "in the end of justice if that spilled over from any named plaintiff to systemic changes that would improve the world of the jail's population overall. . . ."  Tr. at 140:20-25 (Hatfield).  The Court then explained that it would take the Motion under advisement, and would produce an opinion with findings of fact and conclusions of law.  See Tr. at 141:1-10 (Court).  The Court also stated that it would examine the medical record exhibits filed with the Defendants' Memorandum in Support of Motion for Summary Judgment as to Paul Matamoros' Section 1983 Claim, filed November 11, 2015 (Doc. 102 in Salazar v. San Juan), in its consideration of the Motion requesting injunctive relief.  See Tr. 146:2-17 (Childress, Clerk, Court).

**6.      The First Supplemental Response.**

34.     The Defendants filed a supplemental response on January 7, 2016.  See First Supplemental Response at 1.  The Defendants first explain that they have now obtained releases for Veneno and Dominguez -- two non-parties that gave testimony at the hearing on the motion.  See First Supplemental Response at 2.  The Defendants state that they have attached medical records for Veneno and Dominguez to the First Supplemental Response as Exhibits 1 and 2, but that they are still waiting for a release from Yarnell -- another non-party who presented testimony at the hearing.  See First Supplemental Response at 2.  The Defendants assert that the records for Veneno and Dominguez "belie their testimony that there was no deliberate indifference to their medical needs[,]" First Supplemental Response at 2, and they spend the next two pages explaining why that is the case, see First Supplemental Response at 3-4.

35.     The Defendants conclude their First Supplemental Response by asserting that "the case at bar seeks the extraordinary remedy of a disfavored Preliminary Injunction."  First Supplemental Response at 4.  According to the Defendants, such disfavored injunctions must be

more closely examined, see First Supplemental Response at 4-5 (quoting Schrier v. Univ. of Colo., 427 F.3d at 1258-59), and here, "[t]he medical records of the witnesses establish that Plaintiffs simply cannot make the required 'strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms," First Supplemental Response at 4-5 (quoting Navajo Health Found. v. Burwell, 2015 U.S. Dist. LEXIS 56242, at *112).

> **7.      The Second Supplemental Response.**

36.      The Defendants filed a second supplemental response on January 12, 2016.  See Second Supplemental Response to Motion for Injunctive Relief, filed January 12, 2016 (Doc. 166 in Salazar v. San Juan)("Second Supplemental Response").  In the Second Supplemental Response, the Defendants attach additional medical records for Matamoros that San Juan Regional Medical Center produced on December 11, 2015.  See Second Supplemental Response at 2.

**CONCLUSIONS OF LAW**

The Court will outline generally the applicable law surrounding preliminary injunctions. It will then describe the applicable law related to the Eighth Amendment.  It will then analyze the Motion.

**I.      LAW REGARDING PRELIMINARY INJUNCTIONS.**

1.      "It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a

district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."[22]  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  See Winter v.

---

[22]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits.  43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than actual success.").  It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success."  11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2948.3 (footnotes omitted).  The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought."  Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

At a trial on the merits, a plaintiff bears two burdens of proof.  The first burden is the burden of production, which is sometimes called the burden of going forward.  If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury.  Second is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied the ultimate standard of proof -- usually the preponderance-of-the-evidence standard.  There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presented evidence of such great extent and one-sidedness that he or she is entitled to a verdict as a matter of law.  Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.).  The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant.

Moreover, satisfying the initial burden of production is known as presenting a "prima facie case."  Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a]

Natural Res. Def. Council, Inc., 555 U.S. 7, 19 (2008)("Winter")("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008)).  The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

2.      "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary

---

party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor").  The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion.  See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."  (footnotes omitted)).    The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result.  See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage.  As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest.  Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the part of the enjoined party; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004))(internal quotation marks omitted). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975). With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation marks omitted).

3.    "[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enter., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## II.      LAW REGARDING THE EIGHTH AMENDMENT.

4.      When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  The second condition represents the functional application of the deliberate indifference standard.  See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component."  (quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003))).

5.      Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused."  Helling v. McKinney, 509 U.S. 25, 36 (1993).  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  Helling v. McKinney, 509 U.S. at 36

(emphasis in original).   "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  Helling v. McKinney, 509 U.S. at 36.   The Eighth Amendment does not protect against "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").  The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'"  United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis."  United States v. LaVallee, 439 F.3d at 688.  See also Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury."  United States v. LaVallee, 439 F.3d at 688.

6.     Where a security measure involving the use of force is undertaken to resolve a prison disturbance, the Supreme Court has held that "the question whether the measure taken inflicted unnecessary and wanton pain and suffering [in violation of the Eighth Amendment] ultimately turns on 'whether force was applied in a good faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley v. Albers, 475 U.S. 312, 320-21 (1986)(quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). In a court's inquiry whether the use of force to resolve the disturbance violates the Eighth Amendment under this standard, "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted, are relevant to that ultimate determination." Whitley v. Albers, 475 U.S. at 321 (alterations omitted)(internal quotation marks omitted)(quoting Albers v. Whitley, 546 F. Supp. 726, 733 (D. Or. 1982)). These factors may be used to draw inferences whether the use of force "could plausibly have been thought necessary, or instead evinced such wantonness with respect to unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley v. Albers, 475 U.S. at 321.

7. The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

8.     In Graham v. Connor, the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct.  See Graham v. Connor, 490 U.S. 386, 394-95 (1989).  More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'"  Graham v. Connor, 490 U.S. at 395.  The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct."  Graham v. Connor, 490 U.S. at 395.  The Supreme Court later clarified that its holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).  To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory.  See Cty. of Sacramento v. Lewis, 523 U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.").

9.      In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments."  83 F.3d at 1202.  In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process."  83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990).  Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory.  See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment.").

## III.   LAW REGARDING THE DUE-PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

10.     The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d 1242, 1251 (10th Cir. 2008)(citing DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See

DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. at 195.  "As a general matter, . . . a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. at 197.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1125 (10th Cir. 2008).  Generally, negligence does not trigger the Due Process Clause's protections.  See Davidson v. Cannon, 474 U.S. 344, 348 (1986).

### 1.    **Exceptions to the General Rule.**

11.    There are, however, two exceptions to this general rule.  First, the special-relationship doctrine arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christianson v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-995 (10th Cir. 1994).  Second, the danger-creation theory provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).

### 2.    **Special-Relationship Doctrine.**

12.    The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine.  A plaintiff must show the government's involuntary restraint to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder,

64 F.3d 567, 572 (10th Cir. 1995).  A pretrial detention is one such relationship.  See Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999); Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 277 (10th Cir. 1996)("[I]t [is] clearly established that state officials had a duty to protect individuals whom they had taken involuntarily into their physical custody and control.").

### a.     Pretrial Detainees' Due Process Clause Rights.

13.     The special-relationship doctrine imposes upon prison officials the responsibility to take "reasonable measures to insure the safety of the [detainees]."  Lopez v. LeMaster, 172 F.3d at 759.  When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, however, the Eighth Amendment does not regulate the conduct of the government official's confining that individual.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  As the Supreme Court has explained:

> "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with prosecutions. . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."

City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 (quoting Ingraham v. Wright, 430 U.S. 651, 671-72, n.40 (1977)).  Nevertheless, those government officials must still comply with the protections of the Due Process Clause during that individual's confinement.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 ("The Due Process Clause, however, does require the responsible government or governmental agency to provide medical care to persons, such as Kivlin, who have been injured while being apprehended by the police.").  "In fact, the due process rights of a person in [this] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner."  City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244.  In the Tenth Circuit, a pretrial detainee's due process clause rights parallel that of an

- 67 -

inmate's Eight Amendment rights: "Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment.  In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983."  Lopez v. LeMaster, 172 F.3d at 759 n. 2 (citing Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979)).  Accord Luckert v. Dodge County, 684 F.3d 808, 817 (8th Cir. 2012)("Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment.").[23]  The Tenth Circuit has stated that it is "clearly established that state officials had a duty to protect individuals whom they had taken involuntarily into their physical custody and control."  Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 277 (10th Cir. 1996).

### b.      Prison Officials' Duty to Insure the Safety of Inmates and Detainees.

14.     The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official

---

[23]When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government officials confining that individual.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  As the Supreme Court has explained:

"Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."

City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 (quoting Ingraham v. Wright, 430 U.S. 651, 671-672, n.40 (1977)).

violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the deliberate indifference standard's functional application. See Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)(holding that prison officials violate detainees' due process clause rights when the officials' "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs")(quoting Estelle v. Gamble, 429 U.S. 87, 106 (1976)).

15.     Analyzing whether the plaintiff has satisfied the first element, the objective element,  "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original).  "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").

16.     The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Courts apply this subjective

inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred.  Wilson v. Seiter, 501 U.S. at 299.  A defendant has the requisite culpable state of mind under the subjective inquiry only where the defendant's conduct evidences conscious disregard of a substantial risk of harm.  See Self v. Crum, 439 F.3d at 1231.

> A prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Self v. Crum, 439 F.3d at 1231 (quoting Farmer v. Brennan, 511 U.S. at 837).  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness."  Farmer v. Brennan, 511 U.S. at 836.  For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

### c.    Detainee Suicide.

17.    For a detainee suicide, a plaintiff must prove the prison official was deliberately indifferent to the detainee's risk of suicide:

> Claims arising from a failure to prevent prisoner suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody. Thus, a plaintiff bringing such a claim must prove that his jailer was "deliberately indifferent to a substantial risk of suicide."

Gaston v. Ploeger, 229 F. App'x 702, 709-710 (10th Cir. 2007)(unpublished opinion)(quoting Barrie v. Grand County, 119 F.3d 862, 869 (10th Cir. 1997)).  In Gaston v. Ploeger, the Tenth Circuit held that the objective component of the test is always satisfied in the case of suicide,

because the harm suffered is "[o]bviously" sufficiently serious.  229 F. App'x at 710.  For the subjective component to be met, however, the Tenth Circuit held that there must be evidence either that the prison official had "knowledge that an inmate is suicidal" or the inmate must have been "an obvious suicide risk." Gaston v. Ploeger, 229 F. App'x at 712. "[T]he threshold for obviousness is very high."  Gaston v. Ploeger, 229 F. App'x at 710 (citing Perez v. Oakland County, 466 F.3d 416, 435-36 (6th Cir. 2006), and Collins v. Seaman, 462 F.3d 757, 761 (7th Cir. 2006)).

**9.    Danger Creation Exception.**

18.    The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  Under a danger creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.   To state a prima facie case, the plaintiff must show that his or her danger creation claim for due-process violations meets a six-part test:  (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008).

19.     The Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."   Medina v. City & County of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & County of Denver, 960 F.2d at 1496.

**4.     What Shocks the Conscience.**

20.     If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of "shocking the conscience."  Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. the City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. the City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotations omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. the City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

21.     Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge.  See James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively.").   Even where a government acts with sufficient culpability for tort liability, perhaps warranting even punitive damages, the Court has found that the government's conduct still failed to rise to the level of shocking the conscience.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1074-1075 (D.N.M. 2010)(Browning, J.)(finding that school's failure to act after three complaints about conduct that could "arguably be characterized as sexual assault," and then pointing out the plaintiff as the victim at a school assembly regarding the conduct, "may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages," but did not shock the conscience).

22.     Because "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner," County of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998)(quoting City of Revere v. Massachusetts Gen. Hospital, 463 U.S. at 244), a finding of deliberate indifference in a claim for failure to provide for a detainee's serious medical needs shocks the conscience as a matter of law:

> Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls.  To be sure, we have

expressly recognized the possibility that some official acts in this range may be actionable under the Fourteenth Amendment, and our cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim in at least one instance.  We held in <u>City of Revere v. Massachusetts Gen. Hospital</u>, 463 U.S. 239 . . . (1983), that the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner.  Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, . . . it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial.

<u>Cty. of Sacramento v. Lewis</u>, 523 U.S. at 849-50 (internal citations and quotations omitted).

## IV.   <u>RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE</u>.

23.    Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages.  <u>See</u> <u>Coffey v. United States</u>, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(citing <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86 (2003)).  "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  <u>Ramirez v. Armstrong</u>, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, <u>overruled on other grounds by</u> <u>Folz v. State</u>, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.  <u>See</u> <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 672, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard

of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 51, 752 P.2d 240, 243.

24.    New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186.  The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

25.    "As a general rule, an individual has no duty to protect another from harm." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 143, 45 P.3d 80, 84.  "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 626, 875 P.2d 379, 382 (1994).

26.    "[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 33, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

27.    "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## V.    LAW REGARDING THE ADA.

28.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Federal courts have described the ADA as "a general prohibition against discrimination by public entities, regardless of activity."  New Directions Treatment Servs. v. City of Reading, 2007 U.S. App. LEXIS 14025, at *12 (3d Cir. June 15, 2007).  See PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001)("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals.").  "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations

(Title III)." PGA Tour, Inc. v. Martin, 532 U.S. at 675 (internal footnotes omitted). To prove an ADA violation, a plaintiff must establish: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003).

29.     Private entities that operate a "public accommodation" may also be liable under the ADA for discrimination against disabled individuals "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). For the purposes of applying the Act to providers of public accommodations, "discrimination" includes

> failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). Accordingly, the statute implicates three inquiries: (i) "whether the requested modification is 'reasonable;'" (ii) "whether it is 'necessary' for the disabled individual;" and (iii) "whether it would 'fundamentally alter the nature of' the [service being provided]." PGA Tour, Inc. v. Martin, 532 U.S. at 683 n.38 (quoting 42 U.S.C. § 12182(b)(A)(ii)).

## VI.   LAW REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

30.     The following elements must be proven to establish a claim of intentional infliction of emotional distress: "[(i)] the conduct in question was extreme and outrageous; [(ii)]

the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(iii)] the plaintiff's mental distress was extreme and severe; and [(iv)] there is a causal connection between the defendant's conduct and the claimant's mental distress." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (2001).  For purposes of the tort of intentional infliction of emotional distress, New Mexico law adopts the Restatement (Second) of Torts' definition of extreme and outrageous conduct.  See Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d at 342.  According to the Restatement (Second) of Torts, extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965).  See UJI 13-1628 NMRA ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").  The Restatement (Second) of Torts § 46 states:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts § 46 cmt. d (1965).

31.    Extreme and "[s]evere emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d at 343 (internal quotation marks and citations omitted).  "The law intervenes only where the distress is so severe that no reasonable person could be expected to endure it." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d at 343 (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).  The extreme

and severe emotional distress element of intentional infliction of emotional distress was not met, for example, where a plaintiff felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits.  Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d at 343.

## ANALYSIS

1.      The Court will deny the Motion.  First, the requested injunction falls into all three of the Tenth Circuit's three categories of disfavored injunctions -- it is a mandatory injunction, it alters the status quo, and it would afford the Plaintiffs all the relief that they could recover at the conclusion of a full trial on the merits.  Nonetheless, the Plaintiffs have shown a likelihood of irreparable harm, that the balance of harms weighs in their favor, and that the requested injunction is not adverse to the public interest.  The Plaintiffs, however, have not shown a likelihood of success on the merits.

## I.      THE REQUESTED INJUNCTION FALLS INTO ALL THREE CATEGORIES OF DISFAVORED PRELIMINARY INJUNCTIONS.

2.      The Tenth Circuit has identified three categories of disfavored preliminary injunctions -- mandatory injunctions, injunctions that alter the status quo, and injunctions that give the movant all the relief to which he or she would be entitled if he or she won at trial -- and the Court concludes that the requested injunction is a mandatory injunction that alters the status quo and provides the Plaintiffs all the relief to which they would be entitled if they won at trial.  See Schrier v. Univ. of Colo., 427 F.3d at 1258.  A district court can determine whether a requested injunction is disfavored by looking at the relief it seeks.  See Schrier v. Univ. of Colo., 427 F.3d at 1258.  The strength of the movant's case or of the nonmovant's defenses, the peril that the movant faces if the request is denied, and the burden that the requested injunction would impose on the enjoined party -- considerations of central importance in deciding whether to grant

a preliminary injunction -- have no effect on this analysis.  The analytical effect of branding a requested preliminary injunction as "disfavored" is that it "warrants a heightened standard of proof," Schrier v. Univ. of Colo., 427 F.3d at 1259, and that it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course," O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975.  A request for a disfavored injunction must thus make a stronger holistic showing in the four-prong analysis.[24]  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975.

3.     The first disfavored category is "mandatory preliminary injunctions."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 977)(internal quotation marks omitted).  The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.) (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the

---

[24]A request for a disfavored preliminary injunction is also not entitled to the Tenth Circuit's relaxed or "modified" substantial-likelihood-of-success standard, which reduces the plaintiff's required showing of that prong to raising "questions going to the merits [that] are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002).  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975-76 ("[B]ecause a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard.").

enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.  It does so because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it.  Cf. Nat'l Fed'n of Indep. Business v. Sebelius, 132 S. Ct. 2566, 2589 (2012)("To an economist, perhaps, there is no difference between activity and inactivity . . . ."); O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 1006 (Seymour, J., dissenting)("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing.").  An injunction directing a party to do something is not the biggest deal in the world -- and not fundamentally different from an injunction prohibiting something -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction.  On the other hand, necessarily vague injunctions enjoining parties to "depopulate the jail system to constitutionally compliant levels," or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor.

4.      Here, the requested injunction is mandatory.  The Court recognizes that the requested injunction could take many forms.  On the one hand, the Motion generally asks the Court to require the San Juan County Detention Center to provide immediate emergency care to those Plaintiffs suffering from severe medical conditions or, in the alternative, to appoint a special master to oversee medical treatment at the San Juan County Detention Center.  If the Court were to grant such broad, non-specific injunctive relief, the injunction would be mandatory.  It is unclear what "requiring the San Juan Detention Center to provide immediate emergency care to those Plaintiffs suffering from severe medical conditions," as the Plaintiffs request in their Motion, would specifically entail and ascertaining San Juan County Detention

Center's compliance with such an injunction would require the Court to do significant work -- it would not be a matter of the Plaintiffs simply alerting the Court of any infractions.  The Court appointing a special master to oversee treatment at the San Juan County Detention Center would similarly require significant Court oversight.  The Court is hesitant to use the power of the federal judiciary to take on the task of running and managing medical care at the San Juan County Detention Center.  On the other hand, the Plaintiffs suggested that they support narrowly tailored injunctive relief, although they did not provide the Court with much guidance.  The Court could, for example, order the San Juan County Detention Center to transport Matamoros to the emergency room every time he makes such a request.  Such an injunction would not be mandatory because: (i) it would be clear what the Court is ordering -- that Matamoros be taken to the emergency room every time he makes such a request; and (ii) it would be clear what conduct would violate the injunction -- the San Juan County Detention Center refusing to take Matamoros to the emergency room.  The goal of such an injunction would be to keep Matamoros in good health until a trial on the merits.  In other words, there is a range or spectrum of possible injunctive remedies, some of which should be scrutinized more severely than others.  In the end, it does not matter, because the Court concludes that injunctive relief is not appropriate in this case, regardless of the standard used or the specific relief requested.

        5.      The second disfavored category is "preliminary injunctions that alter the status quo." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 977)(internal quotation marks omitted).  The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  Stemple v. Bd. of Educ. of Prince George's Cty., 623 F.2d 893 (4th Cir. 1980).  When evaluating whether the issuance of a requested injunction would alter the

status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975.  If a court instead looks at the parties' legal rights, then a preliminary injunction will always change the status quo. As the Court has stated, injunctive relief could take a variety of forms here, ranging from the Court appointing a special master to oversee medical treatment at the San Juan County Detention Center to the Court ordering the San Juan County Detention Center to take Matamoros to the emergency room any time he requests.  Unlike where a Court orders that a death row inmate not be executed or requires an auction house to not sell an antique arm chair, however, here any preliminary injunction would alter the reality of the existing status and relationships between the San Juan County Detention Center and its inmates.  The Court therefore concludes that, the requested preliminary injunction would alter the status quo.

6.     The third and final disfavored category is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 977)(internal quotation marks omitted).  The meaning of this category is self-evident, and the requested injunction -- or at least some form of the requested relief -- likely falls into this category.  Again, this determination is largely dependent on the injunction that the Court could choose to impose.  If the Court were to appoint a special master to oversee medical care and referrals to the emergency room at the San Juan County Detention Center, the injunction's effect -- both legally and practically -- would not necessarily be temporally limited

to the case's pendency.  On the other hand, if the Court were to order that Matamoros be transported to the emergency room every time he makes a request between now and any trial on the merits, the injunction's effect would be temporally limited to the pendency of this case.  As stated above, the Court could impose a range of injunctive remedies, some of which must be scrutinized more severely than others.  In the end, however, what the precise relief sought is or what precise standard of review the Court uses, does not matter, because the Court concludes that injunctive relief is not appropriate here.

7.     Parts of the requested injunction are thus disfavored at law, while other parts are not disfavored.  Accordingly, the Court will scrutinize some parts of the requested injunction more closely than others.  Either way, the Plaintiffs must still satisfy all four prongs of the standard preliminary-injunction analysis, and, as explained in the subsequent portions of this Memorandum Opinion and Order, they have failed to satisfy all but one of them.

## II.   THE PLAINTIFFS HAVE NOT ESTABLISHED THAT THERE IS A SUBSTANTIAL LIKELIHOOD THAT THEY WILL SUCCEED ON THE MERITS.

8.     The Plaintiffs have not established that there is a substantial likelihood that they will succeed on the merits[25] of their Eighth Amendment, negligence, ADA, and intentional-infliction-of-emotional-distress claims.  First, the Plaintiffs have not alleged that any of the named Plaintiffs are anything other than pre-trial detainees held in confinement before the formal adjudication of their guilt.  While the Fourteenth Amendment's Due Process Clause applies to pre-trial detainees, the Plaintiffs explicitly asserted their 42 U.S.C. § 1983 claims under the

---

[25]The Plaintiffs filed the Motion only against Defendant San Juan County Detention Center.  For the purposes of this Motion, the Court will examine the Plaintiffs' likelihood of success on the merits of their claims against San Juan County Detention Center.  This Memorandum Opinion and Order does not address the Plaintiffs' likelihood of success on the merits of their claims against other Defendants in this case.

Eighth Amendment.  It is correct that the standard under both the Eighth Amendment and the Fourteenth Amendment is deliberate indifference; however, even if the Court granted the Plaintiffs leave to amend their Complaints, it would still conclude that there is insufficient evidence that the Defendants acted with deliberate indifference as to Matamoros, and given the record, thus, as to all Plaintiffs.  Second, the Court concludes that the Plaintiffs have not established that there is a substantial likelihood that they will succeed on the merits of their negligence, ADA, and intentional infliction of emotional distress claims.

> ### A.    THE PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EIGHTH AMENDMENT CLAIM.

9.    All of the Plaintiffs appear to be pre-trial detainees, to which the Eighth Amendment does not apply.  While it is correct that "deliberate indifference" is the standard for both the Eighth Amendment and the Fourteenth Amendment, even if the Plaintiffs were to amend their Complaints to correctly plead the Due Process Clause of the Fourteenth Amendment, it would not make a difference, because the Court concludes that the Plaintiffs have not produced sufficient evidence for the Court to conclude that they have shown it is likely that the Defendants acted with deliberate indifference to their medical needs.

> ### 1.    All of the Plaintiffs Appear to be Pre-Trial Detainees, to Which the Eighth Amendment Does Not Apply.

10.    When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government official's confining that individual.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  The Supreme Court has explained:

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with prosecutions. . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is

> concerned until after it has secured a formal adjudication of guilt in accordance
> with due process of law.

City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 (quoting Ingraham v. Wright, 430 U.S. 651,

671-72, n.40 (1977)).  Nevertheless, those government officials must still comply with the Due

Process Clause's protections during that individual's confinement.  See City of Revere v. Mass.

Gen. Hosp., 463 U.S. at 244 ("The Due Process Clause, however, does require the responsible

government or governmental agency to provide medical care to persons, such as Kivlin, who

have been injured while being apprehended by the police.").  In other words, it is established that

"the Eighth Amendment . . . . serves as the primary source of substantive protection to convicted

prisoners," or inmates, Whitley v. Albers, 475 U.S. at 327, while the Fourteenth Amendment's

Due Process Clause provides Matamoros' and the other Plaintiffs' protections and their right to

be provided adequate medical care as a detainee:

> The rights of pretrial detainees, "those persons who have been charged with a
> crime but who have not yet been tried on the charge," are not controlled by the . . .
> Eighth Amendment because the Fifth and Fourteenth Amendments prohibit
> punishment "prior to an adjudication of guilt in accordance with due process of
> law.  The critical juncture is conviction, either after trial . . . or by plea, at which
> point the state acquires the power to punish and the Eighth Amendment is
> implicated."

Berry v. City of Muskogee, 900 F.2d at 1493 (quoting Bell v. Wolfish, 441 U.S. at 535).

11.     Here, the Plaintiffs brought their 42 U.S.C. § 1983 claim explicitly under the

Eighth Amendment and not pursuant to the Fourteenth Amendment's Due Process Clause.  Each

of the Complaints in the four consolidated case, state: "COUNT I: Violation of 42 U.S.C. § 1983

Eighth Amendment Prohibition Against Cruel and Unusual Punishment."  Salazar Complaint ¶¶

73-82, at 9-10; Carter Complaint ¶¶ 38-47, at 6-7; Jones Complaint ¶¶ 34-43, at 5-6; Burkee

Complaint ¶¶ 154-164, at 21-22.  Count I of each complaint is identically worded except that the

Salazar Complaint, Carter Complaint, and Jones Complaint are each worded so as to apply to a

single plaintiff, while the Burkee Complaint is worded so as to apply to twenty-seven plaintiffs.

See Salazar Complaint ¶¶ 73-82, at 9-10; Carter Complaint ¶¶ 38-47, at 6-7; Jones Complaint ¶¶ 34-43, at 5-6; Burkee Complaint ¶¶ 154-164, at 21-22.  After stating that the Court has jurisdiction pursuant to 42 U.S.C. § 1983, the Burkee Complaint, for example, states:

> 157.   **Plaintiffs had a clearly established right under the Eighth Amendment** to be free from deliberate indifference and reckless disregard for known serious medical needs.
>
> . . . .
>
> 159.   Havel acted with deliberate indifference to Plaintiffs' serious medical needs and constitutional rights by willfully ignoring plaintiffs' repeated requests for medical attention and intentionally deprived plaintiffs of care.
>
> 160.   On information and belief, Havel instructed SJCDC staff to intentionally deprived [sic] plaintiffs of constitutional rights and violated SJCDC's internal policies in order to save money.

. . . .

> 164.   Plaintiffs also seek appropriate declaratory and injunctive relied pursuant to 42 U.S.C. § 1983 to redress the ongoing deliberate indifference in policies, training and supervision **with respect to the serious medical needs of patients and inmates in violation of the Eighth Amendment of the Constitution.**

Burkee Complaint ¶¶ 154-164, at 21-22 (emphasis added).

12.   Moreover, the Plaintiffs do not refer to the Fourteenth Amendment in any of the Complaints.  See Salazar Complaint ¶¶ 73-82, at 9-10; Carter Complaint ¶¶ 38-47, at 6-7; Jones Complaint ¶¶ 34-43, at 5-6; Burkee Complaint ¶¶ 154-164, at 21-22.  Instead, they cite exclusively and unequivocally to the Eighth Amendment.  See Salazar Complaint ¶¶ 73-82, at 9-10; Carter Complaint ¶¶ 38-47, at 6-7; Jones Complaint ¶¶ 34-43, at 5-6; Burkee Complaint ¶¶ 154-164, at 21-22.  As explained above, the Eighth Amendment applies only to individuals held in confinement after the formal adjudication of that individual's guilt, while the Fourteenth

Amendment's Due Process Clause applies to pre-trial detainees.  None of the four Complaints allege that any of the Plaintiffs are or were individuals held in confinement after the formal adjudication of guilt at the San Juan County Detention Center.  For example, as to Plaintiff Gordon Derrick, the Burkee Complaint alleges that he was "incarcerated in SJCDC in February 2013 for misdemeanor charges that were eventually dismissed."  Burkee Complaint ¶ 51, at 8.  Regarding Plaintiff Debbie Nez, the Burkee Complaint states that she "was incarcerated in the San Juan County Detention Center in 2013; when she was arrested . . . ."  Burkee Complaint ¶ 115, at 16.  Further, at the hearing, the Plaintiffs indicated that they believe Matamoros is still a pre-trial detainee:

> THE COURT: Is he convicted and serving a sentence.

> MR. HATFIELD: I don't even know at this stage, Your Honor, I think he's still a pretrial detainee, but he does manage to get out and go back sometimes.

Tr. at 123: 9-14 (Court, Hatfield).

13.    It is the Court's understanding that the San Juan County Detention Center is a jail -- where individuals are often held after arrest or before trial -- and not a prison -- where individuals are incarcerated after the formal adjudication of guilt.  Nonetheless, it may be that some people serve their incarceration for misdemeanors at the San Juan County Detention Center or are otherwise not moved to state prison.  The facility may contain a mixture of pre-trial detainees and people convicted of crimes and the Plaintiffs may be a mixture.[26]  The Plaintiffs, however, have not advised the Court precisely of each Plaintiffs' status, nor have they alleged or

---

[26]Veneno's testimony at the November 24, 2015, hearing on the Motion supports the view that the San Juan County Detention Center is a mixed facility.  Veneno stated that at some point he was moved from cell block B1 to C1, and explained: "C1 is regular inmates that are serving like six to two years.  And I had no business being in that population at all.  I was not a criminal.  I just had a little misdemeanor that I was trying to straighten out.  And I was treated like a criminal."  Tr. at 22:19-23 (Veneno).

informed the Court in their pleadings, briefs, or at the hearing on the Motion, that the Plaintiffs

are anything other than pre-trial detainees.  The Court, in the past, has dismissed Complaints

because pre-trial detainees insufficiently plead Eighth Amendment violations, see, e.g., Chavez

v. Bd. of Cty. Com'rs of Sierra Cty., 899 F. Supp. 2d 1163, 1185-87 (D.N.M. 2012)(Browning,

J.), and it would be inequitable to not apply the same standard here, where experienced counsel

represents the Plaintiffs.  Moreover, the Supreme Court has made clear that a plaintiff must plead

the correct constitutional provision underlying the § 1983 claim to state a valid claim:

> As we have said many times, § 1983 "is not itself a source of substantive rights,"
> but merely provides "a method for vindicating federal rights elsewhere
> conferred."  In addressing a[ ] . . . claim brought under § 1983, analysis begins by
> identifying the specific constitutional right allegedly infringed. . . .  The validity
> of the claim must then be judged by reference to the specific constitutional
> standard which governs that right. . . ."

Chavez v. Bd. of Cty. Com'rs of Sierra Cty., 899 F. Supp. 2d at 1185 (quoting Graham v.

Connor, 490 U.S. at 393-94).

14.    In sum, because the Plaintiffs have pled the Eighth Amendment -- and not the

Fourteenth Amendment -- they are unlikely to succeed on the merits on all pre-trial detainees,

including Matamoros.  It is correct that the "deliberate indifference" is the standard for both the

Eighth Amendment and the Fourteenth Amendment, but as subsequently explained, even if the

Plaintiffs were to amend their Complaints to correctly plead the Fourteenth Amendment for pre-

trial detainees, and, specifically for Matamoros, it would not make a difference.  In the end, the

Plaintiffs have not produced sufficient evidence that the Defendants acted deliberately indifferent

to their medical needs.

2.     **Even if the Plaintiffs had Correctly Pled the Due Process Clause of the Fourteenth Amendment -- Rather than the Eighth Amendment -- the Plaintiffs have Not Produced Sufficient Evidence for the Court to Conclude that They Have Shown it is Likely that the Defendants Acted with Deliberate Indifference to the Plaintiffs' Medical Needs.**

15.     Regardless whether the Plaintiffs plead their 42 U.S.C. § 1983 claim under the Eighth Amendment or the Fourteenth Amendment, the Court concludes that the Plaintiffs are unlikely to succeed on the merits of their claim that the Defendants acted deliberately indifferent to their medical needs.  The Court cannot meaningfully grant injunctive relief for the benefit of Plaintiffs who are dead, see Salazar Complaint; Carter Complaint; Jones Complaint, or are no longer incarcerated at the San Juan County Detention Center.  The Court also agrees with the Defendants that the Plaintiffs lack standing to seek relief for individuals who are not parties to this lawsuit.  The Motion refers to Matamoros, Yarnell, and Dominguez, and Veneno also testified at the hearing.  Yarnell, Dominguez, and Veneno are not parties to this lawsuit.  Further, Dominguez and Veneno are no longer incarcerated at the San Juan County Detention Center. The Court is concerned by the facts surrounding Veneno's incarceration at the San Juan County Detention Center.  If he were a party to this lawsuit, and if he were currently incarcerated at the San Juan County Detention Center, the Court would, on the record before it, find that the Defendants were deliberately indifferent to his medical needs.

16.     Without Yarnell, Dominguez, and Veneno, however, the Court is ultimately left with Matamoros and the other Plaintiffs named in the Burkee Complaint that are currently incarcerated at the San Juan County Detention Center.  Matamoros is the only Plaintiff that testified at the hearing or submitted an affidavit with the Motion, and the Court assumes that he is the Plaintiff with the strongest case.  In other words, the injunction rises and falls with Matamoros, and if he is not entitled to injunctive relief, none of the Plaintiffs are, even if the

Court takes into account -- as it does -- the other hearing witnesses' stories in support of Matamoros' claims.  Even so, and assuming that Matamoros' experience is a "representative sampling" of all the Plaintiffs, the Court concludes that he is unlikely to succeed on the merits of his claim that the Defendants were deliberately indifferent to his medical needs.

17.     A claim for inadequate medical attention will be successful if the plaintiff shows "deliberate indifference to serious medical needs."  Martinez v. Beggs, 563 F.3d at 1088.  As explained above, the test for deliberate indifference is both objective and subjective.  See Martinez v. Beggs, 563 F.3d at 1088.  The objective component of the test if satisfied if the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused."  Helling v. McKinney, 509 U.S. at 36.  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Helling v. McKinney, 509 U.S. at 36 (emphasis in original).  "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson v. McMillian, 503 U.S. at 9-10.

18.     The second element regarding the government official's state of mind is a subjective inquiry.  See Wilson v. Seiter, 501 U.S. at 298.  The subjective component of the test

is met if the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The Tenth Circuit has noted, with regard to the subjective component, that, "[t]o prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it . . . ." Martinez v. Beggs, 563 F.3d at 1089. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258). Further, evidence of medical treatment also undercuts any claim of deliberate indifference. See Randall v. Bd. of Cty. Comm'rs, 184 F. App'x at 727 (concluding that there was no deliberate indifference where the jail log indicated that the plaintiff was administered daily medication and was transported to the hospital on various occasions); Clemmons v. Bohannon, 956 F.2d 1523, 1529 (10th Cir. 1992)(finding no deliberate indifference where plaintiff was consistently given medications and was examined after complaints). Finally, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." Perkins v. Kansas Dep't of Corrections, 165 F.3d 803, 811 (10th Cir. 1999)(citing Estelle v. Gamble, 429 U.S. at 107).

19.     Here, Matamoros has received medical treatment specifically for the injury set forth in the Motion. In this opinion's Factual Background section, the Court found that: (i) Matamoros developed a severe rash on his groin and penis; (ii) that seven days before August 26, 2015, he began experiencing the problem; (iii) that he repeatedly told the nurses about the

problem; (iv) that three days before August 28, 2015, he began feeling pain in his penis; (v) that a doctor then examined Matamoros' penis and told him to fill out a kite; (vi) that on August 26, 2015, and August 27, 2015, Matamoros filled out kites; (vii) that on August 28, 2015, he was transported to the emergency room where blood work was done, an STD test was administered, an IV was administered, a CT scan of his abdomen and pelvis was performed, a doctor looked at his penis and diagnosed him with a yeast infection; (viii) that he was prescribed cream and antibiotics; (ix) that his penis got worse after returning to the San Juan County Detention Center; (x) that he was then informed that he had experienced an allergic reaction to the medications; (xi) that he was eventually put on Prednisone, at which point his penis started to improve; (xii) that he was then taken back to the hospital on September 24, 2015, after filing kites on September 6, 2015, September 11, 2015, and September 20, 2015; (xiii) that by September 24, 2015, his penis was three-fourths of the way healed, and during his visit to the hospital on September 24, 2015, he informed the doctors that it was fine; (xiv) that the skin on his penis is now black and has open wounds, and is still partially numb; (xv) that he has been informed that they are going to take him to see a urologist; and (xvi) that he is currently in fear of losing his penis and of his infection spreading.

20.     Based on these findings, the Court concludes that the Defendants were not deliberately indifferent to Matamoros' medical needs. Matamoros began experiencing penis pen seven days before August 26, 2015. While it may have been negligent to not attend to his needs until he started experiencing pain three days before August 28, 2015, the Defendants did not act with deliberate indifference. Once Matamoros started experiencing pain, he met with a doctor who instructed him to file a kite. Moreover, after filing kites on August 26, 2015, and August 27, 2015, Matamoros was taken to the hospital on August 28, 2015, where he was given a CT

scan, an IV, and an STD test; saw a doctor who diagnosed him with a yeast infection; and was provided with medications.  After an allergic reaction, the course of treatment was changed, and Matamoros was taken to the hospital for a second time on September 24, 2015.  Again, the delay between Matamoros filing a second round of kites on September 6, 2015, September 11, 2015, and September 20, 2015, may have been negligent, but it does not cross the threshold into deliberate indifference.  Moreover, the evidence of medical treatment -- two emergency room treatments, tests, medication, and alterations in a course of treatment -- undercut any claim of deliberate indifference.  See Randall v. Bd. of Cty. Comm'rs, 184 F. App'x at 727 (concluding that there was no deliberate indifference where the jail log indicated that the plaintiff was administered daily medication and was transported to the hospital on various occasions); Clemmons v. Bohannon, 956 F.2d 1523, 1529 (10th Cir. 1992)(finding no deliberate indifference where plaintiff was consistently given medications and was examined after complaints).

21.     Finally, as explained above, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."  Perkins v. Kansas Dep't of Corrections, 165 F.3d at 811 (10th Cir. 1999)(citing Estelle v. Gamble, 429 U.S. at 107).  That the initial round of medications produced an allergic reaction is not that unusual, and Matamoros cannot say that the Defendants acted with deliberate indifference with that occurrence.  Maybe Matamoros will be able to establish that providing that prescription or medicine was negligent, but without more, the prescription does not look like deliberate indifference at this preliminary stage.  Further, that Matamoros was not swabbed or tested for serious, life-threatening illnesses, such as MRSA, does not evidence deliberate indifference under the Federal Constitution -- maybe not under state law either.  Decisions about course of treatment and whether such tests should be administered are best left to medical professionals.

The Court is reluctant to second-guess such decisions, at least under constitutional law. Moreover, for similar reasons, the Court also concludes that Matamoros has not set forth sufficient evidence of deliberate indifference regarding his back pain or his complaint of not being sent to a neurosurgeon.  The Court agrees with the Defendants that back pain alone, and particularly of short-term detainees, "would not even meet the objective component of the test for deliberate indifference, as it is not sufficiently serious to be a cognizable claim."  Response at 11 (citing Curran v. Aleshire, 67 F. Supp. 3d at 766)(finding that neck and back pain are not serious medical needs).  Even if back pain alone is sufficiently serious, however, Matamoros' medical records demonstrate that he received extensive medical attention: (i)   he received medications and other treatment for his back pain at the San Juan County Detention Center, see Exhibit 2; Exhibit 6; Exhibit 8; Exhibit 11, (ii) he received a Lumbar spine MRI on September 11, 2014, see Exhibit 3; (iii) he received additional diagnostic testing on September 30, 2014, see Exhibit 4; (iv) he was evaluated by a physical therapist at the San Juan Regional Medical Center on November 4, 2014, see Exhibit 7; (v) he completed eight physical therapy sessions between November 10, 2014, and December 4, 2014, see Exhibit 7; (vi) he underwent a second round of diagnostic testing on December 17, 2014, see Exhibit 9; and (vii) he received an injection from Dr. Jones at the San Juan Regional Medical Center on February 13, 2015, see Exhibit 12; Exhibit 14.  As to Matamoros' complaint about not being sent to a neurosurgeon, the Court credits the medical records submitted by the Defendants demonstrating that Matamoros saw Dr. Kainth, who stated that "[t]his is not a life-threatening problem and he is currently neurologically intact." Exhibit 17 at 1.   Moreover, even if Matamoros was denied treatment by a specialist neurosurgeon, the Defendants are correct that, such a denial would not rise to the level of a constitutional violation.  See Response at 12 (citing Woodson v. Barlow, 2012 U.S. Dist. LEXIS

73952 (finding that a prisoner's contention that he was denied treatment by a back specialist insufficient to establish a constitutional violation)).

22.    The Court has spent many hours reading and digesting the substantial medical records submitted regarding Matamoros' treatment while incarcerated at the San Juan County Detention Center, which belie any assertion of deliberate indifference.  The Court has thoroughly examined a total of approximately three-hundred-and-two pages of medical records generated regarding Matamoros from the period of July 30, 2014 to the present.  In the end, the Court concludes that Matamoros has failed to produce sufficient evidence that the Defendants acted with deliberate indifference as to his medical needs.  Whether pled under the Eighth Amendment or the Fourteenth Amendment, the Plaintiffs' request for an injunction fails as a matter of law, because they are unlikely to succeed on the merits.

### B.    THE PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR OTHER CLAIMS.

23.    The Plaintiffs also assert claims for negligence, violations of the ADA, and intentional infliction of emotional distress.  The Court concludes, however, that the Plaintiffs cannot show "a substantial likelihood of success on the merits" with respect to their negligence, ADA, and intentional-infliction-of-emotional-distress claims.  Regarding their ADA claims, the Defendants correctly note that the Plaintiffs do not allege that Matamoros or any other Plaintiff are being "discriminated against because of a qualifying disability."  Response at 13-14.  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132.  To prove an ADA violation, a plaintiff must establish: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or

was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability."  Hargrave v. Vermont, 340 F.3d at 34-35.  On their ADA claims, the Plaintiffs allege only that:

> 172.   Defendants herein were required by law to observe and adhere to common law and statutory laws and civil rights laws and guarantees in the performance of their duties to or for those who are disable [sic] and are detained at the San Juan County Detention Center.
>
> 173.   Defendants violated their duties under the ADA to make accommodations to plaintiffs with known, obvious, and disclosed disabilities.
>
> 174.   As a result of defendants' actions, plaintiffs suffered damages as described herein and in an amount to be proven at trial and are entitled to damages, attorneys' fees and costs.

Burkee Complaint ¶¶ 172-74, at 24.  The Court agrees with the Defendants that none of the Plaintiffs have alleged that they are individuals with a "qualified disability," and that they were "excluded from participation in a public entity's services, programs, or activities or were otherwise discriminated against by a public entity" on the basis of that disability.  See Hargrave v. Vermont, 340 F.3d at 34-35.  While the Plaintiffs assert that they received inadequate medical treatment at the San Juan County Detention Center, they do not allege that "the alleged inadequacy was due to any qualifying disability."  Response at 14.

24.   The ADA also provides, however, that for the purposes of applying the Act to providers of public accommodations, "discrimination" includes

> failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).  Accordingly, the statute implicates three inquiries: (i) "whether the requested modification is 'reasonable;'" (ii) "whether it is 'necessary' for the disabled

individual;" and (iii) "whether it would 'fundamentally alter the nature of' the [service being provided]."   PGA Tour, Inc. v. Martin, 532 U.S. at 683 n.38 (quoting 42 U.S.C. § 12182(b)(A)(ii)).   The Plaintiffs' allegations, however, again fall short.   None of the Complaints in this consolidated case allege that any of the Plaintiffs have a qualifying disability, that they requested a modification in policies, practices, or procedures, or that such a request was reasonable.   The Court therefore concludes that the Plaintiffs are unlikely to succeed on the merits of their ADA claims.

25.    The Plaintiffs are also unlikely to succeed on their state law claims of negligence and intentional infliction of emotional distress.   The Defendants correctly note that "[s]tate law tort claims against governmental entities are governed by the New Mexico Tort Claims Act (NMTCA)."   Response at 14 (citing N.M. Stat. Ann. 1978 § 41-4-2).   The New Mexico Legislature enacted the NMTCA "in response to the New Mexico Supreme Court's decision to abolish state sovereign immunity in Hicks v. State."   Brenneman v. Bd. of Regents of University of New Mexico, 2004-NMCA-003, ¶ 5, 84 P.3d 685, 686 (citing Hicks v. State, 1975-NMSC-056, 544 P.2d 1153, superseded by statute as stated in Electro-Jet Tool Mfg. Co. v. City of Albuquerque, 1992-NMSC-060, 845 P.2d 770).   The NMTCA provides: "[G]overnmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."   N.M. Stat. Ann. 1978 § 41-4-5.   See Upton v. Clovis Municipal Sch. Dist., 2006-NMSC-040, ¶ 8, 141 P.3d 1259, 1261 ("The TCA grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances.").   Thus, the Plaintiffs' claims for negligence and intentional infliction of emotional distress, as against a governmental entity or a

public employee, must fit within one of the exceptions to the immunity set forth in §§ 41-4-5 to 41-4-12 of the NMTCA.  See Pemberton v. Cordova, 1987-NMCA-020, ¶ 4, 734 P.2d 254, 255.

26.     Here, the Plaintiffs do not point to a waiver of immunity for their negligence and intentional infliction of emotional distress claims.  Moreover, the Defendants assert that the Plaintiffs "cannot point to a waiver of immunity for the asserted claims."  Response at 14 (emphasis added).  The Court has reviewed the waivers of immunity set forth in Sections 41-4-5 to 41-4-12 of the NMTCA and agrees with the Defendants that the only potentially applicable waivers are § 41-4-9 -- for operation of certain medical facilities -- and § 41-4-12 for certain acts of law enforcement.  Section 41-4-9 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

N.M. Stat. Ann. 1978 § 41-4-9.  The Defendants are correct, however, that the New Mexico Court of Appeals decision in Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d at 179, forecloses the Plaintiffs' reliance on § 41-4-9.  See Response at 15.  There, an inmate was arrested and booked into the Metropolitan Detention Center ("MDC").  2008-NMCA-085, ¶ 3, 187 P.3d at 180.  He was then subjected to a medical and mental health intake by Correctional Medical Services, Inc. ("CMS"), which had contracted with the City of Albuquerque to provide medical services at the MDC.  See 2008-NMCA-085, ¶ 3, 187 P.3d at 180.  During the intake, the inmate disclosed that he was a heroin user, and that he had prescriptions for Valium and hydrocodone.  See 2008-NMCA-085, ¶ 3, 187 P.3d at 180.  He was referred to the MDC detoxification unit, where his vital signs were regularly monitored and he received several medications.  See 2008-NMCA-085, ¶ 3, 187 P.3d at 180.  "Over the ensuing eleven hours,

medical personnel noted that Decedent exhibited tremors, nausea, vomiting, and muscle aches and that he complained of sleeplessness," symptoms consistent with heroin withdrawal.  2008-NMCA-085, ¶ 3, 187 P.3d at 180.  Personnel also noted "bizarre behavior."  2008-NMCA-085, ¶ 3, 187 P.3d at 180.  The inmate was subsequently released from jail, at which point he wandered off from the jail parking lot into the nearby desert where he died of hypothermia.  See 2008-NMCA-085, ¶¶ 4-8, 187 P.3d at 180-81.

27.     The Court of Appeals of New Mexico rejected the plaintiff's argument that § 41-4-9 applied, holding that liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services.  See 2008-NMCA-085, ¶¶ 28-30, 187 P.3d at 185.  The Court of Appeals of New Mexico explained:

> We agree with the general proposition stated in *Estelle* and *Ancata* that governmental entities must provide appropriate medical care to persons they incarcerate.  *See Estelle*, 429 U.S. at 103; *Ancata* 769 F.2d at 705.  Such governmental entities cannot escape that duty by contracting with third parties to provide the medical care, and a governmental entity "remains liable for any constitutional deprivations caused by the policies or customs of the [third party]." *Ancata*, 769 F.2d at 705.  This is not to say, however, that a governmental entity's constitutional obligation equates with waiver of immunity for negligent operation of an infirmary under New Mexico's TCA.  If Plaintiff had alleged and could prove that the City's inadequate medical care deprived Decedent of a constitutional right, Plaintiff might be entitled to recover under the waiver of immunity provided in Section 41-4-12.  But, as discussed in the next section of this opinion, Plaintiff's allegations of conduct that is merely negligent are insufficient to establish such a constitutional violation.  *See Ancata* 769 F.2d at 703 (indicating that claim of constitutional deprivation in the context of inadequate medical care requires a showing of "deliberate indifference to serious medical needs").
>
> Because it was CMS that operated the infirmary or like facility at MDC, we affirm the district court's summary judgment in favor of the City under Section 41-4-9.

2008-NMCA-085, ¶¶ 30-31, 187 P.3d at 185.  Here, it is undisputed that, like in <u>Lessen v. City of Albuquerque</u>, San Juan County contracted with Correctional Healthcare and San Juan

Regional Medical Center to provide healthcare at the San Juan County Detention Center. Accordingly, the Defendants cannot be held liable under § 41-4-9 for negligence and for intentional infliction of emotional distress.  In sum, the Plaintiffs are unlikely to succeed on the merits of their negligence and intentional infliction of emotional distress claims pursuant to the waiver of immunity set forth in § 41-4-9.

28.     The Court now turns to § 41-4-12 of the NMTCA, which  "provides a waiver of immunity for certain torts that law enforcement officers commit and for negligence that causes a specified tort."  Williams v. Bd. of Regents of University of New Mexico, 20 F. Supp. 1177, 1189-90 (D.N.M. 2014)(Browning, J.)(citing Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006).  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. 1978 § 41-4-12.

> Thus, in order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 7, 916 P.2d 1313, 1316.

29.     As the statutory definition of "law enforcement officer" includes "any full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense," N.M. Stat. Ann. § 41-4-3(D), correctional

officers are law enforcement officers if and only if the facility in which they work holds primarily inmates awaiting trial rather than convicts. See Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1269 (D.N.M. 2010)(Browning, J.); Davis v. Bd. of Cty. Comm'rs of Dona Ana Cty., 1999-NMCA-110, ¶ 35, 987 P.2d at 1183. Compare Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶¶ 9-12, 875 P.2d 393, 397 (holding that correctional officers who work at facilities that principally house individuals already convicted of crimes are not law enforcement officers), with Abalos v. Bernalillo Cty. Dist. Attorney's Office, 1987-NMCA-026, ¶¶ 26-30, 734 P.2d 794, 800 (holding that the director of a jail that housed primarily inmates awaiting trial was a law enforcement officer for the purposes of § 41-4-12). Based on the available evidence, the San Juan County Detention Center appears to be a facility whose inmates are primarily individuals awaiting trial. It may, however, be a mixed facility, containing pre-trial detainees and people incarcerated for misdemeanor or lessor offenses. The Defendants have not asserted otherwise or presented evidence to the contrary. Once the appropriate section is identified, the analysis is straightforward.

30.     Section 41-4-12 "simply does not -- either on its face or through its construction by the New Mexico courts -- set forth a waiver of immunity for negligence." Williams v. Bd. of Regents of University of New Mexico, 20 F. Supp. at 1193. Moreover, the Court addressed this precise issue in Williams v. Bd. of Regents of University of New Mexico where it explained:

> Plaintiffs' confusion stems from the literal manner in which the New Mexico courts have interpreted the language of the statute, which waives immunity from liability for "injury . . . resulting from assault, battery, false imprisonment . . . ." N.M. Stat. Ann. § 41-4-12 (emphasis added). The courts interpret this waiver as encompassing any situation in which a law enforcement officer's actions "result" in injury from one of the enumerated intentional torts, even if the officer himself was not the one who committed the tort. See Dickson v. City of Clovis, 2010-NMCA-058, ¶ 20, 242 P.3d at 403-04 ("[A]llegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party

to commit one of the enumerated intentional acts."); <u>Methola v. Eddy Cty.</u>, 1980-NMSC-145, 622 P.2d 234; <u>Weinstein v. City of Santa Fe</u>, 1996-NMSC-021, 916 P.2d 1313.  If a law enforcement officer's negligence causes an inmate to be thrown to the wolves -- attacked, raped, or subjected to any of the other torts enumerated in the statute by people the officer should have known not to allow around the inmate -- the officer cannot hide behind the general rule of immunity against negligence claims.  <u>See</u>, <u>e.g.</u>, 1980-NMSC-145, ¶¶ 2-4, 26, 622 P.2d at 235, 239.

      It is upon these cases, <u>Methola v. Eddy County</u> and <u>Weinstein v. City of Santa Fe</u>, that the Plaintiffs rely, but the cases stand for what Bernalillo County says they do: one of § 41-4-12's enumerated torts must be the direct cause of the Plaintiff's injury, which in this case means that, "without demonstrating that Defendant CHC engaged in a specific tort found under that particular subsection of the NMTCA, Plaintiffs' claim of alleged negligent supervision against Defendant County fails and should be dismissed."  Reply at 7.  As none of the six claims alleged in the SAC -- medical negligence, negligence per se based on the Emergency Medical Treatment and Active Labor Act, simple negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, or loss of consortium -- is on the list of torts enumerated in § 41-4-12, the Plaintiffs' claim of negligence is subject to immunity under § 41-4-4, and fails as a matter of law.

20 F. Supp. at 1193-94.  Similarly, here none of the claims alleged in any of the Complaints is on the list of torts that § 41-4-12 enumerates.  Accordingly, for the reasons stated in <u>Williams v. Bd. of Regents of University of New Mexico</u>, the Court concludes that the Plaintiffs are unlikely to succeed on their negligence claim.  Moreover, this same analysis applies to the Plaintiffs' intentional-infliction-of-emotional-distress claim, and the Court likewise concludes that they are unlikely to succeed on the merits of that claim.  In so far as the requested injunction is conceived of as mandatory, it follows that the Plaintiffs cannot meet a "heightened standard" or make a "strong showing" with regard to the likelihood of success on the merits of their ADA, negligence, and intentional infliction of emotional distress claims.  <u>See</u> <u>Schrier v. University Of Colo.</u>, 427 F.3d at 1260-61; <u>Little v. Jones</u>, 607 F.3d 1245, 1251 (10th Cir. 2010).

## III.   THE HARMS THAT THE REQUESTED PRELIMINARY INJUNCTION SEEKS TO AVOID WOULD BE IRREPARABLE.

31.    The Court concludes that the Plaintiffs have succeeded in showing that they will suffer irreparable injury if no preliminary injunction is entered in this action.  A showing of irreparable injury is a necessary condition for the issuance of a preliminary injunction.  See Vega v. Wiley, 259 F. App'x 104, 105 (10th Cir. 2007)(unpublished).  Regarding irreparable harm, the Tenth Circuit has explained:

> Case law has provided some guidance, however, noting for example that injury "must be both certain and great," *id.*; and it must not be "merely serious or substantial."  *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1976).  Cases have also noted that irreparable harm is often suffered when "the injury can[not] be adequately atoned for in money," *id.*; or when "the district court cannot remedy [the injury] following a final determination on the merits."  *American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980).

Prarie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001).  Moreover, "[w]hen an alleged constitutional right is involved, most courts hold no further showing of irreparable injury is necessary."  McClendon v. City of Albuquerque, 272 F. Supp. 2d 1250, 1259 (D.N.M. 2003)(Vasquez, J.)(citing Kikumura v. Hurley, 242 F.3d at 963).

32.    The substance of the Plaintiffs' Motion focuses on the irreparable harm being the likelihood of future deaths, pain and suffering, and the fear of illness, and death at the San Juan County Detention Center.  See Motion ¶ 32, at 7.  Each of the complaints also states that declaratory relief is "necessary to prevent immediate and irreparable harm, including constitutional and statutory violations, policy violations, serious injury and death."  Salazar Complaint at 13; Carter Complaint at 10-11; Jones Complaint at 9; Burkee Complaint at 25.  In other words, the Plaintiffs contend that there are two fundamental senses in which the requested injunction seeks to avoid irreparable harm: (i) the injunction seeks to avoid serious injury, death, pain, and suffering; and (ii) it seeks to avoid constitutional, statutory, and other violations.

33.     The Court agrees with the Defendants that "[o]nce a petitioner is no longer affected by the alleged conduct, any attempt at injunctive relief is inappropriate as moot." Response at 5 (citing Hollon v. Mathis Indep. Sch. Dist., 491 F.2d 92, 93 (5th Cir. 1974)).  Here, the San Juan County Detention Center's alleged failure to provide for inmates' medical needs does not continue to affect Dominguez or Veneno.  Further, many of the other Plaintiffs named in the Burkee Complaint are no longer incarcerated at the San Juan County Detention Center, see Burkee Complaint, and three of the Plaintiffs are dead, see Salazar Complaint at 13; Carter Complaint at 10-11; Jones Complaint at 9.  The Court concludes, however, that the Plaintiffs have demonstrated that Matamoros and the other named Plaintiffs in Burkee v. San Juan have sufficiently demonstrated that the harm which the requested injunction seeks to avoid -- violations of their constitutional rights -- would be irreparable.  See McClendon v. City of Albuquerque, 272 F. Supp. 2d at 1259 (citing Kikumura v. Hurley, 242 F.3d at 963).  In sum, the denial of the Plaintiffs' Eighth Amendment rights is a harm that cannot fully and adequately be compensated monetarily and, for that reason, the Court concludes that the Plaintiffs have succeeded in showing that they will suffer irreparable injury if no preliminary injunction is issued in this action.

## IV.    THE BALACE OF HARMS WEIGHS IN THE PLAINTIFFS' FAVOR AND THE REQUESTED INJUNCTION WOULD NOT BE ADVERSE TO PUBLIC INTEREST.

34.     To be entitled to entry of a preliminary injunction, the Plaintiffs must also demonstrate that "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party" and that "the injunction, if issued would not be adverse to the public interest."  Schrier v. University Of Colo., 427 F.3d at 1258.  While the Plaintiffs address the balance of harms in their Motion, they do not address whether the requested injunction would

be adverse to the public interest.  See Motion ¶¶ 34-38, at 7-9.  On the balance of harms prong, the Plaintiffs assert that "the only detriment to the defendants of injunctive relief (in assigning an independent doctor to review all inmate medical issues on a weekly or bi-weekly basis, for example), would be merely monetary," while the harm to the Plaintiffs would be the likelihood of future deaths, injury, pain, and suffering.  Motion ¶¶ 32-34, at 7.  As described above, there is a spectrum of injunctive relief that the Court could grant, ranging from the Court appointing a special master, to the Court ordering San Juan County Detention Center "to provide immediate medical care to inmates whose medical needs are not being met," to the Court ordering San Juan County Detention Center to transport Matamoros to the emergency room every time he makes such a request.  Regardless what injunctive relief the Court were to impose along this spectrum, the Court agrees that the only detriment to the Defendants would be monetary.  The potential harm to the Plaintiffs is indeed the likelihood of future injuries and deaths, but more importantly, potential constitutional violations.

35.     The Defendants maintain that the County spends a substantial amount of money on medical care for inmates of the San Juan County Detention Center.  See Response at 17.  The Defendants explain:

> For fiscal year 6/30/2012 to 6/20/2013, the County spent $3,347,340.39 on inmate care.  [Exhibits "7" and "8."]  This number includes the annual amount paid to the entity with whom the County contracted to provide medical care and the amounts paid for additional services.  For the fiscal year ending 6/30/2014, the County spent $3,632,712.51 and for the fiscal year ending 6/30/2015, the County spent $3,184,857.48.  [Exhibits "7" and "8."].

Response at 17-18.  The spreadsheet included with Kristi Galloway's affidavit, see Affidavit of Kristi Galloway, filed October 26, 2015 (Doc. 73-7 in Salazar v. San Juan), which is attached to the Response, also notes that, for fiscal year 6/30/2015 to 6/30/2016, the County spent $2,962,735.64 on inmate care,  see Spending Spreadsheet, filed October 26, 2015 (Doc. 73-8 in

Salazar v. San Juan).  While cost is certainly a consideration, the San Juan County Detention Center must provide sufficient inmate medical care to comply with the Constitution.  The Court also notes that the San Juan County Detention Center is quote large, averaging over 600 prisoners on a daily basis.  See Tr. at 139:11-14 (Childress).  Moreover, the cost of the injunction would depend on whether the Court were to issue limited injunctive relief specifically for Matamoros, or whether it would, for example, appoint a special master to oversee medical care at the San Juan County Detention Center.  In sum, the Court concludes that the risk of deaths or injuries, and the risk of constitutional violations, outweighs the economic damage a wrongful preliminary injunction would inflict upon the San Juan County Detention Center.

36.     For the same reasons that the Court concludes that the requested preliminary injunction succeeds on the balance-of-harms prong, the Court concludes that it also succeeds on the public-interest prong.  In sum, the Court concludes that the Plaintiffs have failed to make one out of the four showings required to warrant the grant of preliminary injunction.  The Court therefore denies the Motion.

**IT IS ORDERED** that the Plaintiff's Motion for Injunctive Relief Against Defendant San Juan County Detention Center, filed September 28, 2015 (Doc. 48 in Salazar v. San Juan), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory M. Tucker
Mitchel S. Burns
Jennifer D. Yoder
Christian A. Hatfield
Tucker Burns Yoder & Hatfield Law Firm
Farmington, New Mexico

--and--

John Holland
Erica Grossman
Anna Holland Edwards
Holland, Holland Edwards & Grossman, PC
Denver, Colorado

 *Attorneys for the Plaintiffs*

Ronald K. Childress
Elaine D. Dailey
Uvashi Parkhani
Childress Law Firm
Albuquerque, New Mexico

 *Attorneys for Defendants San Juan County Detention Center, San Juan County, and Thomas C. Havel*

Robert J. Curtis
Ellen M. Kelly
Civerolo Gralow Hill & Curtis PA
Albuquerque, New Mexico

 *Attorneys for Defendants San Juan Regional Medical Center, Eric Ketcham, and Cindy Ketcham*

Brett C. Eaton
W. Ann Maggiore
Butt Thornton & Baehr, PC
Albuquerque, New Mexico

 *Attorneys for Defendant Katie Moore*

Alfred A. Park
Kevin D. Fowler
Lawrence M. Marcus
Park & Associates LLC
Albuquerque, New Mexico

*Attorneys for Defendant Correctional Healthcare Companies Inc.*


W. Mark Mowery
Jessica R. Terrazas
Rodey, Dickason, Sloan, Akin & Robb
Santa Fe, New Mexico

*Attorneys for Presbyterian Medical Services*